594 A.2d 83 (1991)
WASHINGTON CHAPTER OF the AMERICAN INSTITUTE OF ARCHITECTS, Petitioner,
v.
DISTRICT OF COLUMBIA DEPARTMENT OF EMPLOYMENT SERVICES, Respondent, and
Lindsey Siegfried, Intervenor.
No. 90-1009.
District of Columbia Court of Appeals.
Argued May 23, 1991.
Decided July 12, 1991.
*84 Peter J. Carre, Washington, D.C., for petitioner.
Michael A. Milwee, Washington, D.C., for respondent.
Robert B. Fitzpatrick, with whom David E. Yudin was on the brief, Washington, D.C., for intervenor.
Before ROGERS, Chief Judge, and FERREN and TERRY, Associate Judges.
FERREN, Associate Judge:
The Office of Appeals and Review (OAR) of the Department of Employment Services (DOES) reversed the decision of an Appeals Examiner, who had ruled that the intervenor-employee, Lindsey Siegfried, was ineligible for unemployment compensation because she had voluntarily left her employment. OAR concluded that, on this record, Siegfried's resignation was coerced and thus involuntary, and that she accordingly is entitled to unemployment benefits. The petitioner-employer, the Washington Chapter of the American Institute of Architects (AIA), asks us to review that ruling. We affirm.

I.
Siegfried was employed by the Cincinnati, Ohio Chapter of the AIA until January 1989, when she joined the Washington Chapter of the AIA as Executive Vice President. Her employment agreement provided for a three-year term of office with guaranteed annual compensation of $52,500. The agreement also provided that she would not be discharged without "substantial and serious cause."[1] A few days before an Executive Committee meeting scheduled for August 2, 1989, Arnold Prima, President of the Washington Chapter, called Siegfried and asked her to plan to stay after the meeting. Siegfried testified that Prima gave no indication that anything was wrong or that she should be concerned. On August 1, Siegfried called the Secretary of the Washington Chapter, William Hooper, to ask what he could tell her about the meeting Prima had scheduled with her the next day. Siegfried remembered Hooper telling her that "there was some dissatisfaction and some anger" on both sides of the employment relationship and that "we need to talk some things over."[2]
After the August 2 Executive Committee meeting, five of the Committee members met with Siegfried. Prima told her that "we have no choice but to ask for your resignation." Hooper then gave Siegfried a draft letter of resignation to which a positive letter of recommendation was attached. The resignation letter provided for an additional two months of salary and benefits upon termination of employment, as well as a "suitable positive employment, reference." The letter also contained extensive waiver provisions absolving the AIA of legal liability attributable to Siegfried's leaving her job.
Siegfried testified before the Appeals Examiner that she was:
absolutely and totally in shock, I never expected any such thing, I had never been through anything like that before in my life. I was just in total shock, I just couldn't believe that these people that had recruited me there to do a three (3) year job and that I had signed a contract for [would fire me].
According to Hooper's testimony, Siegfried was "extremely upset" upon hearing the proposal and went into an adjacent kitchen. *85 After approximately three to five minutes, Hooper followed her into the kitchen. Siegfried testified that Hooper told her at the time "that it was very important that [she] sign this letter now" and that "if [she] decided to fight them [she] would never win and [she would] never forget those words."[3] After another five to ten minutes, Hooper led her back to the meeting room.[4] Siegfried, still in shock, agreed to sign the resignation letter if she could have a four-month continuation of her health insurance at AIA's expense.[5] Hooper wrote that provision into the letter. After Siegfried had signed the letter, several Executive Committee members offered to drive her home because of their concern for her state of mind.
Siegfried returned to work the next day, although the resignation letter did not require her to continue working. She then went on a ten-day business trip. Upon her return on August 22, she sent the Executive Committee a letter:
I have been reviewing the highly unusual circumstances surrounding our meeting of August 2, 1989.... Reluctantly, I have come to the conclusion that you attempted to obtain my resignation under extreme duress and coercion. I, therefore, must inform you that I disavow that letter as a resignation or as an expression of any intent to resign, and further, that I consider that letter to be invalid as a waiver of any of my rights under our employment contract or under law.
On August 24, AIA counsel wrote to Siegfried, ordering her to "remove all personal effects and turn in your key []. Your presence at the office is not desired and will not be permitted as of August 25, 1989."[6]
Siegfried filed a claim for unemployment compensation on November 14, 1989. A Claims Examiner ruled that she was ineligible for benefits because her resignation had been "voluntary." See D.C.Code § 46-111(a) (1990). An appeals hearing was held on January 19, 1990. On April 3, the Appeals Examiner ruled that Siegfried's separation was voluntary and without good cause connected with the work, and that, as a consequence, Siegfried was ineligible for benefits. OAR reversed that ruling on July 18. The petitioner-employer objected, and the OAR issued an amended final decision on August 29 specifically noting, in response to the employer's expressed concern, that OAR had considered the petitioner's post-hearing brief. OAR concluded that "[a] careful review of the evidence and testimony of the parties at the appeals hearing fails to support the Appeals Examiner's Decision and conclusions that [Siegfried] voluntarily left her last position. The evidence on record rather supports a finding that [Siegfried]'s leaving was involuntary." This appeal followed.

II.

A.
An employee who leaves work voluntarily without good cause connected with *86 the work is disqualified from receiving unemployment benefits.[7]See Hockaday v. District of Columbia Dep't of Employment Services, 443 A.2d 8, 10 (D.C.1982); D.C.Code § 46-111(a) (1990); 7 DCMR § 311.1 (1986). An employee's departure, however, is presumed to be involuntary, subject to rebuttal. See Hockaday, 443 A.2d at 10. Thus, the employer has the burden of proving the employee left voluntarily. See McLean v. District of Columbia Dep't of Employment Services, 506 A.2d 1135, 1137 (D.C.1986); Green v. District of Columbia Dep't of Employment Services, 499 A.2d 870, 874 (D.C.1985). The legal definition of voluntariness, in this context, means "it [appears] from the circumstances of a particular case that the leaving was voluntary in fact, within the ordinary meaning of the word `voluntary'." 7 DCMR § 311.2 (1986); see Hockaday, 443 A.2d at 10.
The question whether "the employee's action was compelled by the employer rather than based on the employee's volition" must be answered by reference to all the circumstances surrounding the decision to leave. McLean, 506 A.2d at 1137 (quoting Hockaday, 443 A.2d at 10); compare Thomas v. District of Columbia Dep't of Labor, 409 A.2d 164, 171 (D.C.1979) (involuntary resignation because employee received "quit-or-be-fired" ultimatum) and Carpenter v. District Unemployment Compensation Bd., 409 A.2d 175, 178 (D.C.1979) (resignation coerced by pending or threatened personnel action) with Green, 499 A.2d at 877 (no showing employee told to quit or be fired) and Bowen v. District of Columbia Dep't of Employment Services, 486 A.2d 694, 698 (D.C.1985) (employer's letter containing "shape up or ship out" warning resulted in voluntary termination).
Here, both the Claims Examiner and the Appeals Examiner ruled that Siegfried had left voluntarily. The OAR reversed, concluding that, on the undisputed facts of record, Siegfried had been forced to resign.
This case accordingly presents two significant questions: First, in overruling the Appeals Examiner's conclusion that Siegfried had quit voluntarily, did OAR accord due deference to the "credibility determinations of the examiner who heard and evaluated the evidence"? Gunty v. Department of Employment Services, 524 A.2d 1192, 1197 (D.C.1987) (DOES Director may not reject appeals examiner's findings of fact based on witness credibility unless examiner's findings are unsupported by substantial evidence); cf. Dell v. Department of Employment Services, 499 A.2d 102, 106-107 (D.C.1985) (in workers' compensation case, DOES regulation bound Director to substantial evidence review of hearing examiner's decision). Second, this case appears to fall somewhere in between the situations reflected in our other termination cases where voluntariness is an issue: "shape up or ship out" (voluntary) and "quit or be fired" (involuntary). Siegfried apparently was given a third alternative: "quit or stay-and-be-miserable." The question, then, is whether, after Siegfried resigned under such circumstances, the OAR was justified in concluding that Siegfried left involuntarily.

B.
In considering the Gunty issue, we note first that the determination whether an employee's leaving work was "involuntary" or "voluntary" has a legal consequence: *87 the employee will be eligible or ineligible for benefits. Thus, that determination dictates a conclusion of law, not merely a finding of fact. It is true that the regulations define voluntariness as "voluntary in fact, within the ordinary meaning of the word `voluntary'," 7 DCMR § 311.2 (1986) (emphasis added); but the word "fact," in this context, simply means that whether an employee leaves involuntarily or voluntarily (and thus is eligible or ineligible for benefits) is an "ultimate fact"a concept we have equated with a "conclusion of law." Citizens Ass'n of Georgetown, Inc. v. District of Columbia Zoning Comm'n, 402 A.2d 36, 42 (D.C.1979).
In requiring OAR to defer to an Appeals Examiner's findings of disputed fact, unless unsupported by substantial evidence, Gunty was referring not to "ultimate facts" but to what we have called the "subsidiary findings of basic facts" which, taken together, lead to an ultimate fact/legal conclusion. Citizens Ass'n, 402 A.2d at 42 (quoting Dietrich v. District of Columbia Board of Zoning Adjustment, 293 A.2d 470, 473 (D.C.1972)).
In this case, we do not have a Gunty problem because, in reversing the Appeals Examiner's decision, the Director did not "overrule the appeals examiner's [subsidiary] factual findings." Gunty, 524 A.2d at 1195. Rather, OAR accepted the essential facts, including credibility determinations, in the appeals examiner's ruling but held, as a matter of law, that the termination of Siegfried's employment was involuntary, not voluntary. This legal determination is within OAR's prerogative, without need to defer to the examiner's own conclusion. See id. Thus, the question is not whether OAR failed to accord due deference to the Appeals Examinera Gunty issuebut whether, on these facts, OAR's conclusion that Siegfried's resignation was involuntary (and thus compensable) is correct as a matter of law.[8] We turn to that inquiry.

C.
According to the Appeals Examiner's findings, accepted by OAR, the Washington Chapter initiated Siegfried's resignation and drafted the resignation letter without consulting her. Siegfried was not told that she would be asked to resign at the after-hours meeting. The resignation letter mentioned a positive employment reference, and a letter of recommendation was attached to the resignation letter.[9] Hooper, an Executive Committee member, went into the kitchen and suggested to Siegfried that she would best be served by accepting the proposed resignation rather than remaining. There is no evidence that the employer offered Siegfried any palatable option other than resignation; she was not told improvement would result in a work relationship satisfactory to her employer. See Bowen, 486 A.2d at 698 (resignation voluntary in light of shape up or ship out letter). Siegfried, therefore, in effect was told to quit or stay and be miserable, with an implied threat of being fired if she, in some further undefined way, stepped out of line.
Based on these facts, OAR was justified in concluding as a matter of law that the employer's conduct caused an "involuntary separation" and that the appeals examiner erred in ruling otherwise. As we have said in another, similar context:

*88 The testimony was uncontroverted and tended to establish that [employee's] resignation was coerced by representations concerning pending or threatened personnel actions which if completed would have had an adverse effect when she sought other employment. In our view, the Board's appeals examiner was not privileged to disregard this evidence which demonstrated so clearly that petitioner's resignation was involuntary ....
Carpenter, 409 A.2d at 178 (reversing final agency determination). OAR's decision is therefore
Affirmed.
NOTES
[1] More specifically, the agreement provided that Siegfried could be fired for "dishonesty, moral turpitude, gross negligence, incompetence, [or] the failure or inability of the Employee to perform adequately her duties hereunder or material breach of express obligations of this Agreement by the Employee."
[2] There is some dispute about the conversation between Siegfried and Hooper before the meeting. Hooper testified before the Appeals Examiner that Siegfried had asked if she was going to be fired at the upcoming meeting. Siegfried testified she had no reason to believe her job was in danger and that she did not recall asking Hooper if she was going to be fired.
[3] Hooper testified that he "foresaw in the sense of the executive committee, as well as the fact that the upcoming leadership of that Chapter was not going to be a very easy time for her in the future...." Siegfried remembered Hooper's telling her "in a very stern tone of voice that I certainly had never heard him use, telling me in no uncertain terms that if I did not sign this letter I would not receive this letter of recommendation, that that was the indication of the statements that were going on and how very important it was for me to sign this letter."
[4] Sharon Washburn, then Treasurer of the Washington Chapter of the AIA, testified that Siegfried and Hooper came back to the meeting room laughing and joking. Siegfried testified that if she was laughing, her mood swings during the short period of time when the confrontation took place were a sign of the severe stress she was experiencing.
[5] Siegfried testified that despite her shock, health insurance was foremost in her mind because she had recently recovered from major surgery.
[6] This court has held that "once an employee voluntarily resigns from her [or his] job, the employer's decision not to accept a subsequent withdrawal of that resignation does not transform the employee's act into an involuntary one." Wright v. District of Columbia Dep't of Employment Services, 560 A.2d 509, 513 (D.C.1989). The issue here is whether Siegfried's resignation, in the first instance, was voluntary. Siegfried's attempted withdrawal of her resignation has no bearing on whether that resignation was voluntary.
[7] If the employer establishes that an employee left work voluntarily, the employee will still be entitled to unemployment compensation if that employee proves that he or she left for "good cause connected with the work." D.C.Code § 46-111(a) (1990); 7 DCMR § 311.4 (1986); see Wright v. District of Columbia Dep't of Employment Services, 560 A.2d 509, 513 (D.C.1989). In this case, the threshold issue is whether the employer's actions were coercive to the point of compelling an involuntary resignation. Because we answer that question in the affirmative, we do not reach the question whether, if the employee resigned voluntarily, there was "good cause" for doing so. See Kramer v. District of Columbia Dep't of Employment Services, 447 A.2d 28, 30 (D.C.1982) (per curiam) (although undisputed that employee left work voluntarily because of employer's failure to honor promises for work schedule, salary, and overtime, employee left for good cause "as a reasonable and prudent employee under the circumstances").
[8] To sustain an administrative decision in a contested case we must conclude that the decision satisfies three conditions: "(1) the agency [must] make written findings of `basic facts' on all material contested issues; (2) these findings, taken together, must rationally lead to conclusions of law (`ultimate facts') which, under the governing statute, are legally sufficient to support the agency's decision; and (3) each basic finding must be supported by evidence sufficient to convince reasonable minds of its adequacy." Citizens Ass'n of Georgetown, Inc. v. District of Columbia Zoning Comm'n, 402 A.2d 36, 42 (D.C.1979); see Ahmed v. District of Columbia Hackers License Appeal Bd., 501 A.2d 415, 416 (D.C.1985); Perkins v. District of Columbia Dep't of Employment Services, 482 A.2d 401, 402 (D.C.1984); D.C.Code § 1-1509(e) (1987).
[9] The letter states: "I [Siegfried] also understand from discussions that the Washington Chapter of the AIA will provide me with suitable positive employment reference."