**Ruth E. BERKLEY, Petitioner,**

v.

**D.C. TRANSIT, INC., Respondent.**

**No. 07–AA–297.**

District of Columbia Court of Appeals.

Submitted May 22, 2008.

Decided June 19, 2008.

Barbara McDowell and Eric Angel, Legal Aid Society of the District of Columbia, for petitioner.[1]

Before REID and FISHER, Associate Judges, and NEBEKER, Senior Judge.

REID, Associate Judge:

Petitioner, Ruth E. Berkley, seeks review of a decision of the Office of Administrative Hearings ("OAH") affirming a determination of the District of Columbia Department of Employment Services

---

1. Respondent, D.C. Transit, Inc. ("D.C.Transit") did not file a brief, and no attorney filed an appearance despite this court's orders of April 26, 2007, June 4, 2007, and September 14, 2007, requiring the identity of its counsel, and the filing of its brief.

("DOES") disqualifying her from receiving unemployment compensation benefits. Ms. Berkley, who proceeded *pro se* before the OAH, claims that the Administrative Law Judge ("ALJ") inadequately and erroneously explained the employer's burden of proof, and improperly suggested that she had to testify to satisfy her "burden," even though the employer did not appear at the hearing and offered no proof as to whether she voluntarily quit her job. She also claims that OAH improperly analyzed the "voluntary leaving" or "voluntary quit" issue, and further contends that the record does not support a finding that she did not have good cause to leave her position. We reverse OAH's decision and remand this matter to OAH for findings and conclusions not inconsistent with this opinion.

## FACTUAL SUMMARY

The record shows that petitioner, Ruth E. Berkley, filed a request with DOES for unemployment benefits. On February 22, 2007, DOES issued its written notice denying benefits.[2] Four days later, Ms. Berkley appealed the claims examiner's determination to OAH.[3] As "reasons for appeal," she stated: "[The owner of D.C. Transit and his partner] gave me a bounce[d] check, plu[s] he was only giv[ing] me (4) four hrs. or no work at all[;] shudles [sic] was getting short." OAH scheduled Ms. Berkley's hearing for March 16, 2007. On that day, the respondent did not appear. Ms. Berkley was present, but was not represented by counsel.

At the beginning of the hearing, the ALJ informed Ms. Berkley that there were two issues to be addressed in the hearing: (1) jurisdiction, or "whether this Administrative Court has the power and authority to hear this case today"; and (2) "whether [Ms. Berkley] voluntarily left [her] job, and if . . . so, [whether she had] good cause connected with the work." As to the first issue, the ALJ informed Ms. Berkley that her appeal was timely.

With respect to the second issue, the ALJ advised Ms. Berkley that the general rule is an unemployed individual is eligible for benefits, unless the "[c]laimant voluntarily left work."[4] He explained that "if

2. The notice stated that under D.C.Code § 51–110 (2001):

> You are hereby notified of the following determination disqualifying you from the receipt of benefits beginning 02/11/2007 to indefinite 02/09/2008 or until such time as you have been employed in each of ten (10) weeks (whether or not consecutive), have earnings from this employment equal to not less than ten (10) times your Weekly Benefit Amount, and become unemployed through no fault of your own. (citation omitted).

D.C.Code § 51–110 (2001) specifies, in pertinent, part:

> (a) For weeks commencing after March 15, 1983, any individual who left his most recent work voluntarily without good cause connected with the work, as determined under duly prescribed regulations, shall not be eligible for benefits until he has been employed in each of 10 subsequent weeks (whether or not consecutive) and, notwithstanding § 51–101, has earned wages from

employment as defined by this subchapter equal to not less than 10 times the weekly benefit amount to which he would be entitled pursuant to § 51–107(b).

3. OAH is authorized to conduct hearings in adjudicated cases for specified agencies, including DOES. *See* D.C.Code § 2–1831.03 (2007 Repl.).

4. Title 7, § 311 of the District of Columbia Municipal Regulations provides:

> 311.1 Pursuant to § 10(a) of the Act, the Director shall disqualify for benefits any individual who left his or her most recent work voluntarily without good cause connected with the work.
> 311.2 In determining whether a leaving disqualifies an individual for benefits, it shall appear from the circumstances of a particular case that the leaving was voluntary in fact, within the ordinary meaning of the word "voluntary."

the [c]laimant did voluntarily leave work, the [c]laimant can come forward and explain the reasons why she left work, and if they are good reasons ... connected with the job itself, then that overcomes the exception and the [c]laimant will qualify for benefits." The ALJ acknowledged that the respondent, D.C. Transit, was not present and then declared:

It's initially the [e]mployer's burden to establish that the [c]laimant voluntarily left work. However, you have the right to testify today, although you're not obliged to do so. But if you choose to testify, you can meet your burden of explaining if you did, in fact, voluntarily quit work, that you did it for a good reason connected with work.

Immediately following the court's declaration, the following exchange occurred.

Ms. Berkley: Yes, sir.

ALJ: Okay. Do you have any questions about—so far for the court?

Ms. Berkley: No; I guess I'm going to go ahead and state my case.

ALJ: Okay. Well, the way we'll conduct the proceeding today is, you will be provided an opportunity to state your case. You can present any relevant testimony.... Nothing that has been provided to the DOES is part of the record. And I can't use anything other than what you say today and the documents you admit into the record to form my opinion. Your testimony will be under oath, and I will be able to ask you questions.

Ms. Berkley: Okay.

ALJ: The reason why you need to present all your evidence today and documents is because the Office of Administrative Hearings is an independent agency, and we do not have the record from the DOES in front of us today. Are you ready to begin?

Ms. Berkley: Yes, sir.

311.3 A leaving shall be presumed to be involuntary unless the claimant acknowledges that the leaving was voluntary or the employer presents evidence sufficient to support a finding by the Director that the leaving was voluntary.

311.4 If it is established that a leaving was voluntary, the claimant shall have the responsibility of presenting evidence sufficient to support a finding by the Director of good cause connected with the work for the voluntary leaving.

311.5 The circumstances which constitute good cause connected with the work shall be determined by the Director based upon the facts in each case. The test shall be, "what would a reasonable and prudent person in the labor market do in the same circumstances?"

311.6 The following shall not constitute good cause connected with the work for voluntary leaving:

(a) Refusal to obey reasonable employer rules;

(b) Minor reduction in wages;

(c) Transfer from one type of work to another which is reasonable and necessary;

(d) Marriage or divorce resulting in a change of residence;

(e) General dissatisfaction with work;

(f) Resignation in order to attend school or training; and

(g) Personal or domestic responsibilities.

311.7 Reasons considered good cause connected with the work for voluntary leaving include, but are not limited to, the following:

(a) Racial discrimination or harassment;

(b) Sexual discrimination or harassment;

(c) Failure to provide remuneration for employee services;

(d) Working in unsafe locations or under unsafe conditions;

(e) Illness or disability caused or aggravated by the work; Provided, that the claimant has previously supplied the employer with a medical statement; and

(f) Transportation problems arising from the relocation of the employer, a change in the primary work site, or transfer of the employee to a different work site; Provided, that adequate, economical, and reasonably distanced transportation facilities are not available.

The ALJ then posed questions to Ms. Berkley, and she responded. Her responses provided the following information. Ms. Berkley, who has a disability[5] and received disability benefits from the Social Security Administration, obtained employment with D.C. Transit, Inc.[6] through the "Ticket to Work" program. She commenced her duties with the respondent on June 19, 2006, as a driver's assistant.[7] She worked full-time, usually from 6:00 a.m. to 3:00 p.m., or sometimes longer, until the first week of August when she was involved in a verbal exchange with a company dispatcher over a client who had been taken to the Washington Hospital Center, but was not picked up for the return trip. Ms. Berkley had informed the dispatcher that she and the driver had to pick up children in Silver Spring, Maryland, and had to take them to a doctor's appointment, and hence would not be able to make the pick up time for the return trip from the hospital. Following this incident, Ms. Berkley did not receive assignments for approximately two weeks.[8]

Around the first of September, Ms. Berkley returned to a regular work schedule. However, she testified that "some days . . . he didn't have no where for us to go." On one occasion, she accompanied "some disabled kids (clients)" to Ocean City. But, her hours were curtailed. She would, for example, be assigned or paid for only several hours of work and then would be sent home. In addition, Ms. Berkley was transferred to another driver who would make unscheduled stops and run personal errands; also, there was, generally, "a whole lot of carrying on" with the company, and the company's business was declining. "[P]eople started leaving and everything." Ms. Berkley apparently worked some days in October: "we were just driving and we was working and we was getting off—we was getting off at 9:00 and 10:00 at night, and all of a sudden they had this meeting . . . [.][I]t was November 5th to November 11th."

Earlier, the ALJ had inquired, "Can you explain to me what caused the separation from D.C. Transit?" Ms. Berkley responded: "He won't give—he won't giving me no work, . . . he didn't have no work for me." When the ALJ asked Ms. Berkley to "[e]xplain that a little bit, because I think that's the key issue in the case," Ms. Berkley said that around November 5 to 11, the company held a meeting "because people weren't getting paid when they supposed to be getting paid," and she "wasn't making no money." Around November 22, 2006, Ms. Berkley overheard the owner of D.C. Transit informing a lady about a job opportunity at Independent Living, an assisted living company. The lady declined to pursue the job, but Ms. Berkley asked the owner to take her to the job site for an interview.[9] Mr. Johnson transported Ms.

---

**5.** The nature of Ms. Berkley's disability was not identified, but on two occasions she referenced the need to fix her mouth.

**6.** D.C. Transit provides private transportation.

**7.** As a driver's assistant, Ms. Berkeley rode with drivers and was responsible for the manifest, a record of the trips and clients for each day.

**8.** Ms. Berkley called the dispatcher "every day" and was told, "we don't have enough work for you today, call back tomorrow."

Ms. Berkley "said [she] was going to [go] to the Labor Board on it." On September 1, the owner's partner picked her up "and rode [her] around" on what Ms. Berkley referred to as "doing a ghost chase ride," meaning "ain't nobody going no where." He took her to McDonald's, "gave [her] $10.00 to put in [her] pocket," and took her home. D.C. Transit also "paid [her] for four hours."

**9.** Ms. Berkley had "worked in that type of" facility before, "but [she was] going to stick with [the owner of D.C. Transit] because . . . if [she] ever got a chance to get back into this

Berkley to the interview on November 23. She was given a position. When the ALJ asked, "what's the connection with D.C. Transit and the Assisted Living," Ms. Berkley answered:

> [D.C. Transit's owner] just said he met this lady, ... and that she needed somebody to work, and that they were paying $90 a day, and that you had to stay out there for a week, and it sounded all right, so I went on and took—took that position. And he took me out there for an interview.... [S]he gave me the job, and I started that Sunday, the 26th.

In response the ALJ asked: "And that was after you had left D.C. Transit?" Ms. Berkley answered: "Because he didn't have—he didn't have nothing else for me." However, in response to another question from the ALJ concerning whether her last day at D.C. Transit was November 19th, Ms. Berkley said, "Yeah, around November, between the 15th and the 19th ... [,][t]hat week of the 20th because we [ ] got our last check on the 24th." Ms. Berkley could not say whether the owner of D.C. Transit knew it was her last pay check, but again asserted that "he didn't have no work for me." [10]

In its final order OAH's ALJ stated, in part:

> Claimant chose to testify in the absence of [e]mployer but her testimony was vague and at times confusing. She was unable to provide specific dates and did not offer any relevant documentation

relating to the number of trips she had been assigned, the hours she was asked to work, or even whether her income dropped substantially prior to her leaving the job. It is clear however that she became generally dissatisfied with her job in that she did not like the new driver to whom she had been assigned and was not happy with the late hours she was working in November.

> Employer did not appear at the hearing and thus presented no testimony or discussion to carry his burden of establishing that [c]laimant voluntarily left her job. Nonetheless, [c]laimant acknowledges that she voluntarily left her job for a new one and thus her testimony effectively proved [e]mployer's case on that point. 7 DCMR 311.3. However, [c]laimant failed to establish, as she is required to do, that she left her job for good cause connected with the work. 7 DCMR 311.4; *Perkins v. D.C. Dep't of Employment Servs.*, 482 A.2d 401 (D.C. 1984). General dissatisfaction with the job is insufficient cause. 7 DCMR 311.6(e).

> Further, based on the record as a whole, I find that [c]laimant's decision to leave her job in mid-November, 2006, was not the response of a "reasonable and prudent person in the job market." *Gunty [v. Department of Employment Services]*, 524 A.2d [1192] at 1199 [(D.C. 1987)].

> I have considered whether a reasonable employee in [c]laimant's position

type of work, then [she] was going to do that, too." Ms. Berkley said she didn't get any work, that the owner of D.C. Transit "wasn't trying to give me no hours or nothing [ ][a]nd when he started asking this girl about [the assisted living job], I said, well, why don't you take me, and I went for the interview, and I worked there for a week."

**10.** Ms. Berkley "was off" the week of November 20, and when she went in to work on

November 24 to get her pay check, the owner "didn't have no money to give [the workers]." One of the checks Ms. Berkley eventually received, for $192.00, and presented to another vendor in exchange for cash, "bounced." She "would have loved to stay there [at D.C. Transit]," but she ended up having to pay back the vendor who had cashed D.C. Transit's check.

would not have done more to seek assistance from management to schedule trips at more convenient times and be assigned to another driver. *See Freeman v. D.C. Dep't of Employment Servs.*, 568 A.2d 1091, 1093 (D.C.1990) (an employee has an "obligation to preserve [his or] her employment relationship"). In this case, I find that [c]laimant made no effort to get assistance from management as a reasonable employee would be expected to do, and that [c]laimant's decision to quit was driven by her decision to obtain new employment.

## ANALYSIS

### *The Pro Se Litigant and the Burden of Proof*

■ Ms. Berkley argues that the court should remand this case to OAH because the ALJ failed to ensure that she, "a *pro se* litigant unschooled in the law, understood the significance of the burden of proof and the potential adverse consequences of her decision to testify," and that the ALJ's explanation of the burden "was inadequate and confusing" and "erro-

neous." She contends that the ALJ failed to inform her that D.C. Transit "always— not merely 'initially' " had the burden "to prove that [she] left her job voluntarily." And, she was "entitled to prevail without offering any evidence on [the] issue." Furthermore, she asserts, "the ALJ . . . suggest[ed] that her testimony was necessary to decide the case" when he stated, " 'I can't use anything other than what you say today and the documents you admit into the record to form my opinion.' " As a consequence of the ALJ's action and omission, Ms. Berkley claims that she was "denied . . . the opportunity to make an informed tactical decision of paramount importance to her claims."

■ Generally, a *pro se* litigant is entitled to no special treatment, nor substantial assistance from the judge assigned to her case.[11] However, there are exceptions and circumstances which require special care by the judge, meaning that the *pro se* litigant is not "left to fend entirely for [herself]." *MacLeod*, 736 A.2d at 979. These "special circumstances" include cases involving "merely technical, rather than substantive rules of procedure," [12] *id.*

---

11. "[This court] [has] . . . often reiterated the general principle that '. . . a [*pro se*] litigant can expect no special treatment from the court.' " *MacLeod v. Georgetown Univ. Med. Ctr.*, 736 A.2d 977, 979 (D.C.1999). " 'He must not expect or seek concessions because of [his] inexperience and lack of trial knowledge and training and must, when acting as [his] own lawyer, be bound by and conform to the rules of court procedure . . . equally binding upon members of the bar.' " *Id.* (quoting *Solomon v. Fairfax Vill. Condo. IV Unit Owner's Ass'n*, 621 A.2d 378, 380 n. 2 (D.C.1993)). " 'While . . . a *pro se* litigant must of course be given fair and equal treatment, he *cannot generally be permitted to shift the burden of litigating his case to the courts*, nor avoid the risks of failure that attend his decision to forego expert assistance.' " *Id.* (quoting *Dozier v. Ford Motor Co.*, 702 F.2d 1189, 1194 (D.C.Cir.1983)) (emphasis added). Courts

"do[ ] not need to provide detailed guidance to *pro se* litigants." *Moore v. Agency for Int'l Dev.*, 994 F.2d 874, 876 (D.C.Cir.1993) (cited with approval in *MacLeod*, 736 A.2d at 979).

12. The requirement that a judge exercise special care in special circumstances will sometimes require the judge to inform a party of the consequences of her procedural acts or omissions. In *Moore*, the appellant argued that the court erred in dismissing his complaint, in part, because the court failed to alert him to the defects in his complaint, and consequently, in not giving him an opportunity to amend his complaint. 994 F.2d at 877. In so holding, the court reiterated the principle that the judge "should give the *pro se* litigant at least minimal notice . . . of pleading requirements." *Id.* The court also reaffirmed that "[d]istrict courts . . . should supply minimal notice of the consequences of not comply-

at 980, and those concerning a remedial statute, *id.* The District's Unemployment Compensation Act, under which Ms. Berkley sought unemployment benefits, is a remedial statute.[13]

The concept, "burden of proof," is not always clear to one who has studied law, and may well be incomprehensible to a *pro se* litigant, such as Ms. Berkley, who is not schooled in the law. Indeed, in a case involving unemployment compensation benefits, we emphasized that "[t]he term 'burden of proof' is ambiguous, encompassing two separate burdens: the burden of production and the burden of persuasion"; the "former refers to the burden of coming forward with satisfactory evidence of a particular fact in issue," and "[t]he latter constitutes the burden of persuading the trier of fact that the alleged fact is true."[14] We previously placed our discussion of burden of proof in the context of a case in which a claimant was denied unemployment compensation benefits on the ground that he voluntarily left his position, and without good cause.[15] We stressed the fact that a claimant enjoys a presumption of involuntariness, that is, "an employee's de-

parture is presumed to be involuntary unless the employer fulfills its burden of proving the employee left voluntarily."[16] We carefully explained the employer's burden, given the presumption, and in light of the remedial statute governing unemployment compensation benefits, addressing first the policy considerations embodied in the Unemployment Compensation Act:

> Substantial policy considerations underlie the presumption of involuntariness. The basic purpose of the [District of Columbia Unemployment Compensation Act] [ ]is to protect employees against economic dependency caused by temporary unemployment and to reduce the necessity of relief or other welfare programs.

*Green,* 499 A.2d at 875 (citations omitted). We quoted one of our earlier decisions in which we said that the Act "was designed to provide income for workers who are unemployed through no fault of their own until they find new work or at least for a statutorily defined period," and that the Act "should be construed liberally, whenever appropriate to accomplish the legisla-

---

ing with procedural rules." *Id.* at 876. Thus, in *Moore,* a case which this court has stated falls into a category of cases in which "special care" should be given by the trial court, *MacLeod,* 736 A.2d at 981, the circuit court affirmed the trial court's responsibility to inform *pro se* litigants of procedural rules and the consequences of noncompliance. Recently, in *Rhea v. Designmark Serv., Inc.,* 942 A.2d 651 (D.C.2008), an unemployment compensation case involving a *pro se* claimant and a procedural, technical issue, we reiterated the fact that "many complainants [seeking unemployment compensation] are not affluent, nor are they in a position to afford to retain private counsel to conduct ... proceedings before ... [the OAH], and the courts." *Id.* at 655 (citation and internal quotation marks omitted).

13. *See Barnett v. District of Columbia Dep't of Employment Servs.,* 491 A.2d 1156, 1163

(D.C.1985) ("We must also be mindful of the remedial nature of the Unemployment Compensation Act ....."); *see also Cruz v. District of Columbia Dep't of Employment Servs.,* 633 A.2d 66, 69 (D.C.1993). In light of its remedial nature, "procedural technicalities are particularly inappropriate in such a statutory scheme." *Butler–Truesdale v. AIMCO Props.,* 945 A.2d 1170, 1173 (D.C.2008) (quoting *Rhea, supra,* 942 A.2d at 655) (other citation and internal quotation marks omitted).

14. *See Green v. District of Columbia Dep't of Employment Servs.,* 499 A.2d 870, 873 (D.C. 1985) (citations omitted).

15. *Id.* at 871.

16. *Coalition for the Homeless v. District of Columbia Dep't of Employment Servs.,* 653 A.2d 374, 376 (D.C.1995).

tive objective of minimizing the economic burden of unemployment."[17]

■ These policy considerations prompted us to restate and clarify the employer's burden in a case where a claimant is disqualified from receiving unemployment benefits on the ground that she voluntarily quit her job, and without good cause. "A claimant does not have the burden of proving involuntariness"; rather, "the employer [must] prove the leaving was voluntary where voluntariness is contested."[18] And significantly, " 'some presumptions [here, the rebuttable presumption of involuntariness] are founded in part upon exceptionally strong and visible policies, which have been said to persist despite proof rebutting the factual basis for the presumption.' "[19] Equally important, "[s]uch presumptions impose on the parties against whom they operate not only the burden of production but the burden of persuasion as well."[20] "Considerations of fairness argue for placement on the employer of the burden of establishing facts about an employee's discharge . . . ."[21]

We do not decide the scope of the ALJ's obligation to inform a *pro se* litigant about the impact of procedural rules, and we do not suggest that the ALJ should give the *pro se* claimant tactical advice. But, the ALJ has a duty to avoid misleading the claimant to her prejudice. In this case, the ALJ's colloquy with Ms. Berkley regarding the burdens of the employer and claimant was both confusing and errone-

ous. He stated, "it's initially the [e]mployer's burden to establish that the [c]laimant voluntarily left work," and that Ms. Berkley could "meet [her] burden of explaining if [she] did, in fact, voluntarily quit work, that [she] did it for a good reason." Even if Ms. Berkley had some understanding of "burden of proof," she would have been "misled" by the ALJ's words.[22] By using the word "initially," the ALJ left the impression, contrary to our decision in *Green*, that the employer had only the burden of production, and not both the burden of production and the burden of persuasion. Furthermore, upon hearing the ALJ's words, Ms. Berkley may well have believed that she had to provide some explanation to the ALJ as to whether she voluntarily quit her job. Such a belief easily could have been reinforced by two other statements made by the ALJ: (1) "I can't use anything other than what you say today and the documents you admit into the record to form my opinion"; and (2) "The reason why you need to present all your evidence today and documents is because the Office of Administrative Hearings is an independent agency, and we do not have the record from the DOES in front of us today, okay?" These statements by the ALJ strongly suggested that unless Ms. Berkley said something or presented some documentation, the ALJ could not decide the matter in her favor.

Our caution in *McLean v. District of Columbia Dep't of Employment Servs.* re-

---

17. *Green*, 499 A.2d at 875 (quoting *Thomas v. District of Columbia Dep't of Labor*, 409 A.2d 164, 170–71 (D.C.1979)).

18. *Id.* at 873 (referencing *Thomas*, 409 A.2d at 174).

19. *Id.* at 874 (referencing *Davis v. Altmann*, 492 A.2d 884, 886 (D.C.1985)) (quoting *Legille v. Dann*, 178 U.S.App. D.C. 78, 84 n. 39, 544 F.2d 1, 7 n. 39 (1976)) (other citation omitted).

20. *Id.*

21. *Id.*

22. *See Nelson v. District of Columbia Dep't of Employment Servs.*, 530 A.2d 1193, 1196 (D.C.1987) (*"pro se* applicant for entitlement benefits [] potentially misled as to her appellate rights"*).

garding the burden of proof is instructive here: "In *pro se* proceedings, ... clarifications [of the burdens and burden shifting] assume added importance in view of our limited scope of review." [23] In short, we agree with Ms. Berkley regarding her first contention, that she was prejudiced by the ALJ's confusing and erroneous explanation of the burden of proof.

### The "Voluntary Leaving" or "Voluntary Quit" Issue

The ALJ stated, Ms. Berkley "acknowledges that she voluntarily left her job for a new one and thus her testimony effectively proved [e]mployer's case on that point." He found that "she became generally dissatisfied with her job in that she did not like the new driver to whom she had been assigned and was not happy with the late hours she was working in November."

 Ms. Berkley argues that OAH did not properly analyze the "voluntary leaving" issue. "This court must affirm an OAH decision when (1) OAH made findings of fact on each materially contested issue of fact, (2) substantial evidence supports each finding ... (3) OAH's conclusions of law flow rationally from its findings of fact," and (4) "OAH's legal conclusions ... are [not] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." [24] Moreover, we "defer to OAH's findings of fact so long as they are supported by substantial evidence." [25] "Substantial evidence is more than a mere scintilla; [i]t means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." [26] Furthermore, we do not "affirm an administrative determination which reflects a misconception of the relevant law or a faulty application of the law." [27] And, "we cannot affirm an agency decision if 'we cannot confidently ascertain either the precise legal principles on which the agency relied or its underlying factual determinations.'" [28]

 Although a claimant may be disqualified from receiving unemployment compensation benefits because she voluntarily left her employment, as we have said, she is entitled to the presumption that her leaving was involuntary; and the burden of proof on this issue is on the employer. [29] Assessing whether a claimant's leaving was traceable to her own volition, or whether it was compelled by the employer requires a consideration of "'all the circumstances surrounding the

**23.** *McLean,* 506 A.2d at 1138 n. 2:

> We note our concern about the confusion at the hearing before the Appeals Examiner about the basis on which the separation decision would be made, and the failure of the Examiner to identify for the parties who had the burden of proof and when the burden of persuasion would shift. *See Babazadeh v. District of Columbia Hackers' License Appeal Board,* 390 A.2d 1004, 1009 (D.C. 1978) (agency must inform a *pro se* litigant of his basic procedural rights).

**24.** *Rodriguez v. Filene's Basement, Inc.,* 905 A.2d 177, 180 (D.C.2006) (quoting D.C.Code § 2–510(a)(3)(A)(2001)); *see also District of Columbia Dep't of Employment Servs. v. Vilche,* 934 A.2d 356, 360 (D.C.2007).

**25.** *Id.* at 181.

**26.** *Id.* (quoting *Gardner v. District of Columbia Dep't of Employment Servs.,* 736 A.2d 1012, 1015 (D.C.1999) (internal quotation marks omitted)).

**27.** *Thomas,* 409 A.2d at 169.

**28.** *Teamsters Union 1714 v. Public Employee Relations Bd.,* 579 A.2d 706, 709 (D.C.1990) (quoting *Long v. District of Columbia Dep't of Employment Servs.,* 570 A.2d 301, 305 (D.C. 1990)).

**29.** *Washington Chapter of the Am. Inst. of Architects v. District of Columbia Dep't of Employment Servs.,* 594 A.2d 83, 86 (D.C.1991).

decision to leave.' " [30] And, even though the applicable regulation focuses on whether "the leaving was voluntary in fact, within the ordinary meaning of the word 'voluntary,' " [31] the determination of voluntariness or involuntariness "is an 'ultimate fact'—a concept we have equated with a 'conclusion of law' "; thus, we are confronted with a mixed question of fact and law.[32]

We have said that a "resignation in the face of imminent discharge" is an involuntary leaving; and that an employee's departure may be involuntary in the face of " 'quit or stay-and-be miserable' " circumstances.[33] "If the employee's action was compelled by the employer rather than based on the employee's volition, it was not taken voluntarily." [34] In that regard, "whether a discharge is, indeed, imminent is a matter more likely to be within the knowledge of the employer than the employee." [35]

Here, we cannot say that OAH has made findings on the materially contested issue of involuntary or voluntary leaving that are supported by substantial record evidence. Nor can we conclude that OAH applied the proper legal standard in resolving the issue of voluntariness or involuntariness. Specifically, we have doubts that the ALJ looked at all of the circumstances of this case. When she noticed her appeal, Ms. Berkley specifically stated as reasons for her appeal that the owner of D.C. Transit gave her a bounced check, and he was only giving her four hours of work or "no work at all." She did not mention dissatisfaction due to late working hours or her dislike of the new driver. Nor do we read her testimony as emphasizing these dissatisfactions as the reason for asking the owner of D.C. Transit to take her to the assisted living facility for a job interview. Significantly, Ms. Berkley's testimony repeatedly asserted the lack of work, reduced hours, and lack of pay as the reason for her request. Yet, the ALJ made no findings regarding these articulated reasons. Moreover, the ALJ does not mention, and hence may not have considered, that Ms. Berkley's case might fall within the "quit or stay-and-be miserable" category of voluntariness/involuntariness, or the "quit or be fired" [due to lack of money to pay workers'] category.[36]

Although the ALJ characterized Ms. Berkley's testimony as "vague and at times confusing," he did not discredit her testimony. Ms. Berkley repeatedly stated,

**30.** *Id.* (citing *McLean,* 506 A.2d at 1137) (quoting *Hockaday v. District of Columbia Dep't of Employment Servs.,* 443 A.2d 8, 10 (D.C.1982)) (other citations omitted).

**31.** 7 DCMR § 311.2.

**32.** *See Washington Chapter of the Am. Inst. of Architects,* 594 A.2d at 87 (citation omitted).

**33.** *Green,* 499 A.2d at 876 (citations omitted); *Washington Chapter of the Am. Inst. of Architects,* 594 A.2d at 86, 87 (agency's appeals and review office "was justified in concluding as a matter of law that the employer's conduct caused an 'involuntary separation' " due to "quit or stay-and-be-miserable" circumstances).

**34.** *Id.* at 876 (citations and internal quotation marks omitted).

**35.** *Id.*

**36.** The ALJ cited *Perkins v. District of Columbia Dep't of Employment Servs.,* 482 A.2d 401 (D.C.1984), a case involving a "shape up or ship out" scenario. There, the question was whether the petitioner resigned because she faced "imminent discharge" (an involuntary leaving situation). The employer presented evidence, which the ALJ credited, that he had planned to suspend, not fire her, and that on the day he planned to give her the suspension letter, she resigned. There are clear distinctions between the circumstances in *Perkins* and those in the case before us.

in response to the ALJ's questions, that she was not getting work from D.C. Transit, and hence she was not getting paid. Indeed, when the ALJ asked her to "explain to [him] what caused [her] separation from D.C. Transit," Ms. Berkley said: "He [meaning the owner] won't give—he won't giving me no work, . . . he didn't have no work for me." When further asked by the ALJ to "[e]xplain that a little bit, because I think that's the key in the case," Ms. Berkley referenced a meeting held by D.C. Transit around November 5 to 11 "because people weren't getting paid when they supposed to be getting paid"; she also asserted that she "wasn't making no money." As she recounted the circumstances leading up to her working at the assisted living place for a week, Ms. Berkley declared that D.C. Transit "wasn't trying to give me no hours or nothing[ ][a]nd when [the owner] started asking [another employee] about [the assisted living job], [she] said, well, why don't you take me." Even though the ALJ attributed Ms. Berkley's leaving the job to dissatisfaction with late hours of work and the second driver to whom she was assigned, the record reflects her statement, at the time she went for an interview at the assisted living facility, that she was "going to stick with [the owner of D.C. Transit] because . . . if [she] ever got back into this type of work, then she was going to do that, too." When Ms. Berkley went to get her pay check on November 24, before asking D.C. Transit's owner to take her to the assisted living facility, she testified that the owner "didn't have no money to give [the workers]." After she eventually received one check in the amount of $192, for past services, the check bounced, causing Ms. Berkley to have to repay the vendor who had cashed

the check for her. She stated that she "would have loved to stay there [at D.C. Transit]," but she ended up losing the $192, due to insufficient funds in D.C. Transit's account.

In sum, given the lack of findings regarding significant parts of Ms. Berkley's testimony, we have doubts as to whether substantial evidence in the record supports the ALJ's findings and conclusions that Ms. Berkley's dissatisfaction with late working hours and with the new driver prompted her voluntary departure from her position. In addition, we are not confident about the precise legal principles the ALJ considered and on which he relied in drawing his conclusions about the "voluntary leaving" or "voluntary quit" issue, and whether those principles comport with the articulated standards set forth in our case law.[37]

### The "Good Cause" Issue

Even assuming that the record supports a finding and conclusion that Ms. Berkley voluntarily quit her job, that would not be the end of the inquiry, because she "will still be entitled to unemployment compensation if . . . [she] proves that . . . she left for 'good cause connected with the work.'"[38] The ALJ concluded that Ms. Berkley failed to prove that she had good cause for leaving her employment. He stated: "She was unable to provide specific dates and did not offer any relevant documentation relating to the number of trips she had been assigned, the hours she was asked to work, or even whether her income dropped substantially prior to her leaving the job." In addition, the ALJ determined that "[c]laimant's decision to leave her job in mid-November,

**37.** *See Rodriguez,* 905 A.2d at 180; *Thomas,* 409 A.2d at 169; *Teamsters Union 1714,* 579 A.2d at 709.

**38.** *Washington Chapter of the Am. Inst. of Architects,* 594 A.2d at 86 n. 7 (citations omitted).

2006, was not the response of a 'reasonable and prudent person in the job market.'" A reasonable and prudent person in the job market would "have done more to seek assistance from management to schedule trips at more convenient times and be assigned to another driver." Because a reasonable and prudent person in the job market would not have left her job, he concluded that Ms. Berkley quit without good cause.[39]

Ms. Berkley argues that the there was not substantial evidence to support the ALJ's determination that she quit without good cause. She claims that her testimony that she left because her hours had been reduced showed that there was a substantial reduction in her wages and such a reduction was a good cause for leaving D.C. Transit.

▆ In determining whether a claimant resigned from her job for good cause, the ALJ must determine whether a reasonably prudent person would have taken the same action in identical circumstances. 7 DCMR 311.5; *see also Cruz*, 633 A.2d at 70. "The determination of good cause ... is factual in nature...." *Cruz*, 633 A.2d at 70.

As we saw in our analysis of the voluntary leaving issue, when asked by the ALJ to "explain ... what caused [her] separation from DC Transit," Ms. Berkley replied, "He won't giving me no work and these bounce[d] checks and stuff, I couldn't keep on." Under 7 DCMR § 311.7(c), "[f]ailure to provide remuneration for employee services" is a good cause for voluntarily leaving a job. Ms. Berkley repeatedly stated throughout her testimony that she left because the company "didn't have ... work for [her]." She explained that at times she would come to work, be paid only for four hours, or she would only have three to four hours worth of work. This was a substantial change from her earlier work schedule, which the ALJ found was full-time (a 6:00 a.m. to 3:00 p.m. shift, and sometimes 6:00 a.m. until 10:00 p.m.).

It is understandable that a reasonable person who experienced such a change in hours would seek other employment.[40] The ALJ seemed to have considered the fact that Ms. Berkley's hours had been reduced but dismissed this as cause for her resignation because "she was unable to provide specific dates and did not offer ... relevant documentation relating to the number of trips she had been assigned, the hours she was asked to work, or even whether her income dropped substantially prior to her leaving the job." But he also seems to have disregarded her statements about work hours and to have rejected her documentation of her hours and the pay due to her because he found "her testimo-

---

**39.** The ALJ cites *Freeman v. District of Columbia Dep't of Employment Servs.*, 568 A.2d 1091 (D.C.1990). That case is quite different from the one before us. "There the employee made a voluntary decision in fact to change her work status from full time to 'on-call' banquet server, 'voluntarily placing herself in an unprotected position with knowledge that she would be given work only if it was available.'" *Taylor v. District of Columbia Dep't of Employment Servs.*, 741 A.2d 1048, 1049 n. 2 (D.C.1999) (referencing *Freeman*, 568 A.2d at 1093).

**40.** Ms. Berkley also claimed that she did not get paid for overtime hours. This would place her case squarely in 7 DCMR 311.7(c), which states that an employer's failure to pay for overtime is a good reason to voluntarily quit work. It is unclear, however, whether the failure to pay for overtime occurred after she decided not to return to work. There is testimony that suggests that her complaints about not getting paid adequately related to the final check she received after deciding to not return to D.C. Transit.

ny vague and confusing," and her records were not dated and authenticated.[41]

While Ms. Berkley's testimony may have been confusing in some respects, she repeatedly said she was not getting the requisite number of hours of work, that her hours were substantially reduced from full-time to four hours a day, or no hours. She tried to offer documentary proof of her statements, tendering her own records, albeit unauthenticated and unofficial records. The ALJ refused to accept Ms. Berkley's records. Yet, the person who should have had the official records for D.C. Transit, its owner, did not appear at the hearing. And, by imposing on Ms. Berkley, unfairly perhaps, the burden of producing D.C. Transit's signed and authenticated records, the ALJ lost sight of the employer's burden in this type of case.[42] In light of the pressures to resolve substantial unemployment claims in a relatively short period of time, the ALJ may have overlooked the remedial and humanitarian purposes of the Unemployment Compensation Act, as well as the fact that the Act "relies largely on lay persons, operating without legal assistance, to initiate and litigate ... proceedings."[43] In short, on this record, we are unable to say either that substantial evidence supports the ALJ's findings and conclusions on the "good cause" issue, or that, in light of the circumstances of this case, the ALJ properly excluded the documentary proof of hours and pay due and owing to her that Ms. Berkley sought to present.

Accordingly, for the foregoing reasons, we reverse OAH's decision, and remand this matter to OAH for findings and conclusions not inconsistent with this opinion.

*So ordered.*

41. *Ms. Berkley testified that she had started to keep her own records around October in her "little book." For one two-week period, beginning October 10th, she worked 90 hours, but didn't get the proper pay. She stated that the owner of D.C. Transit "looked at all [her] pay stubs and said that [she] was owed the money. And these are all my pay stubs and the time.... I got only 36 hours, I didn't get all my hours." Ms. Berkley also tendered a time sheet for November 5th to November 11th, and started to discuss November 12th to November 18th. However, the ALJ interrupted her and said:*

> Okay. You can take these back. I'm not going to entertain a request to move those documents into the record. I find that there would be no way to authenticate them. They're not signed, they're not on letterhead.

Ms. Berkley also explained that when she did not receive a W2 form from D.C. Transit, she contacted the IRS, and IRS sent her "a 4852 form, a subsidized form for W2 wages and tax statement [Substitute for Form W–2]," which she completed and returned to the agency, together with "a copy of [her] last two pay stubs and bounced check and [her] hours and stuff...."

42. *See Green,* 499 A.2d at 876 ("Considerations of fairness argue for placement on the employer of the burden of establishing facts about an employee's [separation] under such circumstances.").

43. *See Cruz,* 633 A.2d at 69; *Goodman,* 573 A.2d at 1299.