Margaret Ann BUBLIS, Petitioner,

v.

DISTRICT OF COLUMBIA DEPART-
MENT OF EMPLOYMENT
SERVICES, Respondent.

No. 89–416.

District of Columbia Court of Appeals.

Submitted March 13, 1990.

Decided May 30, 1990.

Margaret A. Bublis, pro se.

N. Denise Wilson–Taylor, Washington, D.C., was on the brief, for respondent.

Before SCHWELB and FARRELL, Associate Judges, and KERN, Senior Judge.

FARRELL, Associate Judge:

D.C. Code § 46–111(a) (1987) provides, in part, that "any individual who left his most recent work voluntarily without good cause connected with the work, as determined under duly prescribed regulations, shall not be eligible for [unemployment compensation] benefits...." By regulation, the Director of the Department of Employment Services has determined that among the "[r]easons considered good cause connected with the work for voluntary leaving" is:

Illness or disability caused or aggravated by the work; Provided, that the claimant has previously supplied the employer with a medical statement....

7 DCMR § 311.7(e) (1986). In this case, the Director sustained an appeals examiner's interpretation of this regulation as requiring that the employee have supplied the employer with "medical documentation" in the form of a physician's statement or its

equivalent explaining the illness or disability and consequent need for voluntary leaving. The Director further sustained the examiner's finding that petitioner had failed to supply the required statement. Mindful of our limited scope of review of agency action, we nevertheless are constrained to hold that, in the circumstances of this case, the determination that petitioner failed to furnish a "medical statement" is unsupported by substantial evidence in the record viewed as a whole. D.C. Code § 1–1510(a)(3)(E) (1987). We therefore reverse the denial of benefits.

## I.

From November 1979 to September 1988, petitioner was a Health Education/Community Outreach Social Worker for the East Coast Migrant Health Project (ECMHP). The job apparently required her to change assignments and move to different migrant worker locations in southern states every six months or so.[1] According to the Employer's Statement submitted in connection with petitioner's request for unemployment benefits, in September 1988 petitioner "advised ECMHP [that] she would not accept the position for which she had signed an agreement for (Nashville, N.C.) at the advice of her doctors." At the hearing before the appeals examiner, Dr. John Bartlett testified that petitioner came to his psychiatric clinic in North Carolina on June 17, 1988, complaining of anxiety attacks and an inability to drive her car, which her work required, because of fear and the feeling "that her current life situation was too stressful for her to bear." He diagnosed her as suffering from a major depressive episode, and advised her that "she would be unable to recover from her depressive episodes if she continued to work at [her present] job."

Petitioner apparently was hospitalized briefly, and toward the end of June received a note in the hospital from ECMHP's Assistant Administrator, Helen Kavanagh, stating: "Marge[,] Hang in there and get some rest. We're with you on this. Give a call when you need a cheery hello!"[2] A month later, ECMHP's Administrator, Sister Abhold, wrote petitioner inquiring, "How is your mother? She must be pleased that you are at home with her and helping the healing process with you...." On July 29, 1988, petitioner forwarded a note to ECMHP from a psychiatrist stating: "Mrs. Bublis should remain of [sic; on] leave of absence (sick leave) for 6 add'l weeks." On September 19, 1988, Helen Kavanagh wrote to petitioner "capsuliz[ing]" a telephone conversation they had a few days earlier. The letter confirmed that since petitioner's sick leave and vacation time would expire by September 30, she would then be on a leave of absence from ECMHP, but that, "since you also indicated that there is a strong possibility that you will not continue with ECMHP as strongly suggested by the three doctors you have been working with, ECMHP will need to know within a month's time whether or not you plan to continue." Petitioner left the employment of ECMHP on or about September 30.

At the hearing on petitioner's claim for benefits, Sister Abhold acknowledged that petitioner had called her and told her of the June depressive episode, and informed her that the doctor was recommending she go into another kind of work. Sister Abhold explained, however, that ECMHP had "never received any medical evaluation of [petitioner's] condition," only the physician's note recommending six more weeks of sick leave, and that petitioner had presented no "medical documentation" of any kind to the employer. Petitioner testified that she had been unaware "any of these things were needed" but believed the employer "understood [her situation] in September after my telephone call"; she had been reluctant to provide further details to the employer "be-

---

1. Sister Abhold, the ECMHP Administrator, explained at the hearing that petitioner would contract with the organization every six months or less for a new assignment.

2. In an October 1988 letter to ECMHP's insurer, petitioner explained that after her panic attacks in North Carolina on June 16 and 17, she phoned Sister Abhold "and explained to her my situation. She suggested I get medical help and [a] second opinion."

cause of the confidentiality of anyone seeking help for a psychological or psychiatric problem."

The appeals examiner found that petitioner

did not tell her employer the full reason for her resignation. She did not present any medical documentation concerning her health problem, because she wanted to keep the matter confidential. The employer was given a doctor's statement that said she would be unable to work for six weeks, but it did not elaborate on why the claimant would be out from work.

The examiner construed the "medical statement" regulation as requiring that the employer be furnished with a physician's statement or equivalent documentation establishing an objective connection between the employee's illness or disability and the employment. The Director upheld this determination.

## II.

■ On more than one occasion, we have emphasized that "[g]enerally, the [unemployment compensation] statute should be construed liberally, whenever appropriate to accomplish the legislative objective of minimizing the economic burden of unemployment." *Green v. District of Columbia Dep't of Employment Servs.*, 499 A.2d 870, 875 (D.C.1985), *quoting Thomas v. District of Columbia Dep't of Labor*, 409 A.2d 164, 170–71 (D.C.1979). *See also Cohen v. District Unemployment Compensation Bd.*, 83 U.S.App.D.C. 222, 223, 167 F.2d 883, 884 (1948) ("the Unemployment Compensation Act [must] be interpreted in accordance with its purpose"). Still, benefits under the statute are not available merely for the asking, and with particular reference to D.C. Code § 46–111(a), the Director has determined, permissibly, that a claimant who leaves his employment voluntarily has the burden of proving "good cause connected with the work for the voluntary leaving." 7 DCMR § 311.4; *see Hockaday v. District of Columbia Dep't of Employment Servs.*, 443 A.2d 8, 11 (D.C.1982). One reason the employee may

advance is disability or illness "caused or aggravated by the work"; but, to insure that the employer has the opportunity to ameliorate the work conditions or otherwise provide remedies and so avoid assessment for unemployment benefits, the regulation requires the employee, before quitting, to supply the employer with a "medical statement."

The first question to be decided, then, is whether the agency's construction of this term as requiring a physician's statement or equivalent documentation is a reasonable one compatible with the purposes of the statute. Just as we defer to the agency's reasonable construction of its enabling statute, *e.g., Snipes v. District of Columbia Dep't of Employment Servs.*, 542 A.2d 832, 835 (D.C.1988), so necessarily we accept its reasonable interpretation of its own regulations. *Dell v. District of Columbia Dep't of Employment Servs.*, 499 A.2d 102, 107 (D.C.1985).

■ In *Hockaday, supra*, which involved a claim for benefits arising before the effective date of the regulation at issue here, the Director denied the claim because the petitioner had not proven that "her leaving was justified in the absence of medical advice to leave her work for job connected reasons of health." 443 A.2d at 11. In sustaining the Director's determination, we held that "[i]t is not unreasonable to expect an employee to provide such objective, professional verification; otherwise, there would be no way for the Director to distinguish between real and imagined health problems attributable to the work." *Id.* at 12 (footnotes omitted). We noted that "[t]he position taken by the Director here is similar to the position set forth in the new regulation, effective November 20, 1981, which deals specifically with voluntary termination for health reasons." *Id.* at 12 n. 15. We then quoted the provision involved in this case. What the regulation does, consistently with the Director's previous requirement discussed in *Hockaday*, is require an employee to give *the employer* (and not merely the Director at a post-claim hearing) "objective, professional verification" of the disabling illness and to permit

the employer to take steps, if any, to accommodate the employee and avoid a job-necessitated resignation. The requirement is a reasonable one, for otherwise the employer would have to accept the employee's word concerning an illness and, on that basis, either adjust the work situation or risk assessment for benefits in the event the employee quits.[3] It is not unreasonable for the Director to impose on the employee the burden of supplying professional verification of the disability.

■ The second, and more difficult, question we must decide is whether the appeals examiner's conclusion that petitioner had not furnished the requisite proof is supported by substantial evidence in the record. D.C.Code § 1–1510(a)(3)(E). Our review on this question is similarly deferential, and the mere existence of substantial evidence contrary to the examiner's finding does not allow us to substitute our own judgment for his. *Davis v. District of Columbia Dep't of Employment Servs.*, 542 A.2d 815, 816 n. 2 (D.C.1988); *Hockaday, supra*, 443 A.2d at 12.

The Director does not dispute that petitioner provided the *agency* with "objective, professional verification" that her leaving was for job connected reasons of health. Dr. Bartlett's testimony at the hearing fulfilled this requirement. We conclude, however, that the Director could not, in keeping with the statutory purpose, reject as insufficient the similar information petitioner had supplied to the employer before quitting the job. ECMHP's administrators conceded learning of petitioner's illness during the summer of 1988, and of its general nature. They also acknowledged receiving a psychiatrist's note requesting an additional six weeks of leave for petitioner, which was objective confirmation

that the illness was not feigned. Twice during the summer—once while petitioner was in the hospital—the administrators wrote to her encouraging her to get rest and affirming their support for her in "the healing process." By mid-September they knew, at least from petitioner, that three doctors who had treated her were recommending that she seek another kind of work, a fact recorded in the Employer's Statement submitted at the administrative level that petitioner had resigned on the reported advice of her doctors.

It is true that the employer did not receive documentation—in the form of a written or oral statement by a physician—of the specific nature of petitioner's illness, its job-relatedness, or the fact that it would necessitate her quitting unless some accommodation was made. We conclude, however, that the information possessed by the employer was enough to require it to assume the duty of inquiring further of her about these matters. It must be borne in mind that the regulation refers only to a "medical statement" and that the requirement of documentation by a physician is a gloss—a permissible one—placed upon the language by the agency. The requirement is thus a potential snare for the unwary employee, and for that reason basic fairness dictates that *at some point* the party assumed to have greater knowledge of the regulatory scheme must bear the responsibility of confirming the nature and cause of the illness and the prospect it holds out for resumption of work.[4] We conclude that that point was reached in this case. Had ECMHP requested documentation from petitioner in addition to the psychiatrist's note, and had she failed to comply, then she would have failed in her burden of proof under 7 DCMR § 311.4. But the employer

---

3. Even without the regulation, *Hockaday* would still require the employee to furnish the *Director* with objective, professional verification of the link between illness and need to leave the job, but without the regulation, the employer lacks similar objective information on which to decide whether to accommodate the employee's situation rather than risk a subsequent finding of entitlement to benefits.

4. Here ECMHP knew from petitioner by September 19 that she was "not ready to come back to work with ECMHP" and that very shortly her sick leave and vacation time would be exhausted, with the result that she would then "be on a Leave of Absence from ECMHP" (Letter of September 19 to petitioner from Helen Kavanagh). It also knew from petitioner that several doctors had recommended her resignation. The employer was thus aware of the "strong possibility" that she would quit because of the illness.

did not seek further information of the sort it could reasonably be expected to ask for in deciding whether to further accommodate petitioner or accept the possibility that she would resign and claim unemployment benefits.

In these circumstances, and emphasizing the concrete knowledge which the employer had of petitioner's illness and its likely effect on her future employment, we hold that the agency's conclusion that petitioner failed to supply the required medical statement is unsupported by substantial evidence in the record. Its conclusion is, accordingly,

*Reversed.*