CHIMES DISTRICT OF COLUMBIA, INC., Petitioner,

v.

Patricia O. KING, Respondent.

No. 06–AA–1003.

District of Columbia Court of Appeals.

Argued Nov. 19, 2008.

Decided March 5, 2009.

quire an intent to appropriate property permanently." *In re Pelkey,* 962 A.2d at 278.

Timothy Monahan, with whom Howard K. Kurman and Laura L. Rubenstein, Owings Mills, MD, were on the brief, for petitioner.

Son B. Nguyen, Arnold & Porter, Washington, DC, with whom Barbara McDowell, Legal Aid Society, at the time the brief was filed, and Michael N. Sohn, Arnold & Porter, were on the brief, for the respondent.

Before WASHINGTON, Chief Judge, FISHER, Associate Judge, and KING, Senior Judge.

WASHINGTON, Chief Judge:

Appellant Chimes District of Columbia, Inc. ("Chimes") appeals the District of Columbia Office of Administrative Hearings' award of unemployment benefits to Chimes's former employee, Patricia O. King. We reverse.

## I.

### BACKGROUND

Chimes, a not-for-profit corporation that employs the disabled, hired King in June 2002, as a custodian pursuant to a federal contract in the District of Columbia. King worked for Chimes until January 20, 2006.

In May 2005, King became pregnant. In July 2005, during her eighth week of pregnancy, she submitted a written request for a one-month leave of absence starting on July 25, 2005, and ending on August 26, 2005. Karen Holcomb, Chimes's Benefit Coordinator, determined that King was eligible for sixteen weeks of leave under the D.C. Family Medical Leave Act ("FMLA"). Holcomb notified King of the FMLA and informed King that she may qualify for the sixteen weeks of leave if she submitted the proper paperwork from her medical provider. Holcomb also mailed King a copy of Chimes's policy under the FMLA. Despite King's request for only one month of leave, she used all sixteen weeks (4 months), thereby exhausting her FMLA leave.

While on leave, King submitted letters from her doctor, Susanne Bathgate, M.D., attesting to the high-risk nature of her pregnancy and discussing the duties King could handle in her condition. The first letter, dated October 11, 2005, stated: "I

certify that on October 11, 2005, Patricia King is able to resume performing the functions of [ ] her position [ ] without reasonable accommodation—please give light duty." Holcomb responded to Dr. Bathgate with a letter on October 17, seeking clarification on the doctor's definition of "light duty" and asking whether restrictions should be imposed on King's work. In response, Dr. Bathgate's office faxed a Patient Work Profile dated October 16, 2005, noting that "Ms. King may return to work now." But on October 19, Dr. Bathgate sent a typewritten letter to Holcomb, which read:

Patricia King is under my obstetrical care. Some modifications of her duties should be made to improve her obstetrical outcome. Please limit her duties to lifting no more than 10 pounds. She should also refrain from climbing more than two flights of stairs, pulling and pushing any heavy objects.

On October 21, Holcomb mailed a letter to King explaining that Chimes had received King's doctor's restrictions and it determined that, given the nature of King's work as a custodian, King could not return to work to perform her duties until the restrictions were lifted. Holcomb further explained in the letter that King could continue to use her FMLA leave until November 14, and she should await her doctor's release.

On November 8, 2005, King sent Chimes a second Return to Work Medical Certification, which stated that King could return to work and lift up to 30 pounds and climb more than 2 flights of stairs, on occasion. It further stated that "[King would] be unable to work entirely for 6–8 weeks following delivery."

King did not return to work on November 8, 2005. Holcomb sent her a letter acknowledging that she had exhausted her FMLA leave and Chimes could no longer hold the position open for her. King then contacted Holcomb stating that she wanted to return to work and would seek clarification from her doctor on her restrictions. Holcomb told King that she would need documentation that King could work full duty or confirmation that King's restrictions were lifted.

Chimes faxed a job description to Dr. Bathgate for approval of King's duties, and the doctor responded by approving King's return to work. Dr. Bathgate determined that King was approved to perform her duties from "11/17/05 until the birth of her child." Additionally, King, Holcomb, Chimes's on-site Project Manager, and its Contract Administrator signed and dated a statement which acknowledged that King chose "to continue working before her leave period for birth of her child." King reported to work on November 23, and worked without incident for nearly two months.

King testified that around January 20, 2006, she was experiencing pressure on her lower back and feeling dizzy. She told her direct supervisor, Sarah Price, Chimes's Project Manager at the Department of Interior, that she "wanted to stop work on January 20th" and she asked if her job could be held open for her. According to King, Price said it wouldn't be a problem.

King never provided Chimes with any additional medical documentation for this second leave and King testified that her doctor had no concerns with her ability to work before the birth. She did not contact the Human Resources department or get approval for leave before she stopped working. On January 23, 2006, Chimes mailed a letter to King rejecting her request for time-off and explained that she had exhausted her FMLA leave time. Chimes informed King that she was ineligible for additional leave and it could no

longer hold her position open for her. King was terminated effective January 20.

In February, King sent a letter to Chimes from Dr. Bathgate dated February 7, 2006. In her letter, Dr. Bathgate wrote:

Patricia King is under my care for pregnancy. Her estimated due date is March 13th, 2006. Ms. King has experienced complications this pregnancy and has been unable to work for portions of the pregnancy. After delivery, I anticipate that she will need a minimum of 4 weeks and probably 6–8 weeks recovery. Thank you for helping Ms. King.

The letter did not suggest that King's pregnancy required her to stop working on January 20, 2006.

The District of Columbia Department of Employment Services determined that King was "laid off for lack of work"; and thus, she was eligible for unemployment benefits. On July 26, 2006, Administrative Law Judge Steven M. Wellner ("ALJ") held a hearing on the matter. Holcomb and Price testified at the hearing on Chimes's behalf, and King testified on her own behalf. Judge Wellner affirmed the Department of Employment Services's decision that King was eligible for benefits, but the ALJ determined King was eligible on the basis that she left work voluntarily for good cause (as opposed to the examiner's finding that King left for lack of work).

## II.

### STANDARD OF REVIEW

■ We will set aside an unemployment compensation decision if it is not supported by substantial evidence in the record—*i.e.,* there must be "more than a mere scintilla" of evidence so a reasonable mind might accept that evidence as adequate to support a conclusion. *Hockaday v. District of Columbia Dep't of Employment Servs.,* 443 A.2d 8, 12 (D.C.1982); *accord,* D.C.Code § 2–1510(a)(3)(e); *see Bublis v. District of Columbia Dep't of Employment Servs.,* 575 A.2d 301, 303 (D.C.1990).

## III.

### ANALYSIS

■ The issue here is whether King provided Chimes with sufficient medical information to support the ALJ's decision that she voluntarily quit her job for good cause related to her employment and thus, was qualified to receive unemployment benefits.

■ An individual who leaves her job voluntarily may claim unemployment benefits if she resigned with good cause connected with the work. D.C.Code § 51–110(a) (2006); *see* 7 DCMR §§ 311.3, 311.4, 311.7(e) (2006); *see also Bublis, supra,* 575 A.2d at 303. Good cause is satisfied where the former employee leaves the employer because of an "illness or disability caused or aggravated by the work." *Bublis, supra,* 575 A.2d at 303; *see* 7 DCMR § 311.7. However, before a former employee may qualify for benefits under this provision, she must show that she supplied the employer with a "medical statement" documenting the disability or illness before she resigned "so that the employer can verify the condition and make an accommodation, if necessary." *Branson v. District of Columbia Dep't of Employment Servs.,* 801 A.2d 975, 978 (D.C.2002); *accord* 7 DCMR § 311.7; *Bublis, supra,* 575 A.2d at 303 (employer should receive an opportunity to ameliorate the work conditions or provide remedies).

■ Specifically, in order to qualify for benefits in this case, King had to present substantial evidence that (i) she left Chimes voluntarily, (ii) because of an illness or disability, (iii) that was caused or

aggravated by her work. *See* 7 DCMR § 311.4 (former employee who left work voluntarily has the burden), § 311.7(e). Here, there is no dispute that King left Chimes voluntarily. She told Chimes that her last day would be January 20, 2006, and she did not appear for work thereafter. It is also undisputed that King quit her job because of her pregnancy, and although pregnancy is not a work-related illness, *see Brooks v. District of Columbia Dep't of Employment Servs.*, 453 A.2d 812, 813 (D.C.1982), "[a] voluntary quit because of pregnancy shall be treated like any other voluntary quit because of physical condition or disability." *See* 7 DCMR § 311.11. With regard to the third prong, however, King has failed to establish that her cause for leaving was connected with her work as she did not provide Chimes with sufficient notice that on or about January 20, 2006, her pregnancy was aggravated by her work.

 The requirement that an employee submit to the employer a medical statement or equivalent documentation is mandated by statute but construed liberally, as various forms of documentation are acceptable. *Bublis, supra*, 575 A.2d at 303. Despite its liberal construction, however, the requirement's reigning principle is that some form of documentation must be provided to the employer that substantiates the employee's claim that he or she has a medical condition or disability that is being aggravated by his or her continuing to work.

In *Bublis*, we held that an employer had sufficient notice of a former employee's illness and the illness's likely effect on her employment despite not having received a detailed medical statement from the former employee. *Id.* Bublis took leave from her job because of a major depressive disorder. *Id.* Bublis's physician sent the employer a note stating that she could not work for six weeks, but it omitted details regarding her illness. *Id.* Although the company did not know the specifics of Bublis's condition, it was aware of its general nature and her hospitalization, and it did not need to seek further documentation from Bublis. *Id.* Based on the facts of that case, we held that Bublis had provided sufficient information to her employer to satisfy her burden of providing medical justification for her unavailability and that was enough to shift the burden to the employer to seek further information from Bublis to determine whether to further accommodate her or to accept the possibility that she would resign and claim benefits. *Id.* at 304–05.

Chimes was aware early on that King was experiencing a complicated pregnancy. In fact, King was initially excused from work based on information that Chimes received from her physician. Subsequently, Chimes honored the request of King's physician to modify her job responsibilities in order to accommodate her physical condition. However, at the time King decided to quit working, she did not provide Chimes with any updated medical documentation indicating that her pregnancy was being aggravated by her continuing to adhere to the modified work arrangements that Chimes had put in place for King. Therefore, there is no support in the record for the ALJ's conclusion that King left for good cause connected to her work.

King told Ms. Price that her last day would be January 20, 2006, and that she did not want to work anymore because of her pregnancy. It was anticipated that she would give birth in mid-March. As we noted above, King had pregnancy complications in the fall of 2005, which Chimes acknowledged had made her unable to work. However, while Chimes was on notice of King's previous complications that had prevented her from continuing work in

the fall, King's doctor had subsequently notified Chimes that King could work under modified conditions and Chimes had made accommodations accordingly. King failed to provide Chimes with any updated medical statement in January stating that her pregnancy was being aggravated by her modified workload or that the work was causing any harm to her pregnancy. And, we have already made it clear that pregnancy alone is not a work-related illness. *See Brooks, supra,* 453 A.2d at 813 (pregnant security officer denied benefits after failing to show medical documentation that her work gave her cause for leaving).

While our dissenting colleague finds King's prior notice sufficient under *Bublis* because Chimes "possessed enough information to 'require it to assume the duty of inquiring further of her' about her health," the facts in the instant case undermine his reliance on that doctrine. *See Bublis, supra,* 575 A.2d at 305. Here, unlike in *Bublis,* King's doctor had cleared her to return to work after initially asking that she be excused from work because of complications related to her pregnancy. Thus, her situation is unlike Bublis whose doctor never cleared her to return to work. It was precisely because there was no reason for the employer to believe that Bublis's status had changed with respect to her ability to work that we placed the burden on her employer to request clarification of, or further information regarding, the "medical statement" that had been provided by the doctor if the employer needed that information in order to decide whether to offer an accommodation to the employee or pay unemployment benefits. *See Branson,* 801 A.2d at 978 (to meet the "illness or disability" prong, the employee must provide the employer with a "medical statement" before resigning "so that the employer can verify the condition and make an accommodation if necessary"). Here, King could not rely on her past doctor's note to meet the "medical statement" requirement of the Unemployment Compensation Act, D.C.Code § 51–101 et seq., since her doctor had cleared her to work. Hence, she had to provide a new statement from her doctor to establish that her reasons for leaving were connected with her work as required by the regulations.[1] *See* 7 DCMR § 311.7. King never provided Chimes with such a statement or the opportunity to accommodate her.[2] Therefore, King does not qualify for unemployment benefits based on the theory that she left work voluntarily for good cause connected with the work.

## IV.

## CONCLUSION

Because King did not sufficiently supply Chimes with a medical statement as required by 7 DCMR § 311.7(e), she is not entitled to unemployment benefits. Therefore, the judgment granting Patricia

---

1. Even assuming King orally notified her supervisor that her work was causing her pregnancy complications or aggravating her condition, such oral notification would not suffice to meet the medical statement requirement as it was not "a physician's statement or equivalent documentation." *See Branson, supra,* 801 A.2d at 979 n. 2 (a claimant's oral notification would not suffice as a medical statement).

2. The letter King's physician sent to Chimes after King had left work on January 20, 2006, and had received her separation letter, was not sufficient to establish King's burden. *See Couser v. District of Columbia Dep't of Employment Servs.,* 744 A.2d 990, 991 (D.C.1999) (denying benefits where employee resigned at physician's advice without notifying employer as to the reason and later sent notice to employer of doctor's recommendations).

O. King unemployment benefits is reversed.

*So ordered.*

KING, Senior Judge, dissenting:

Unemployment compensation benefits are a statutory right for those genuinely eligible under D.C.Code § 51–110(a) (2006), and the statute is to be construed broadly to accomplish the legislative and statutory intent of minimizing the economic burden of unemployment. *See Thomas v. District of Columbia Dep't of Labor,* 409 A.2d 164, 170–71 (D.C.1979). Employees presenting sufficient evidence that they left their employment voluntarily, for good cause, and for reasons connected with their work are entitled to benefits. *See* 7 DCMR § 311.4. In my view, appellee Patricia O. King presented sufficient evidence to meet that requirement.

Chimes was certainly aware that King was having medical problems relating to work due to her pregnancy, evidenced by her prior memorandum on work restrictions and her communication to her employer that she would require an additional leave of absence until her child was born. As in *Bublis v. District of Columbia Dep't of Employment Servs.,* 575 A.2d 301 (D.C. 1990), we should hold that the employer possessed enough information to "require it to assume the duty of inquiring further of her" about her health, because "basic fairness dictates that *at some point* the party assumed to have greater knowledge of the regulatory scheme must bear the responsibility of confirming the nature and cause of the illness and the prospect it holds out for resumption of work" (emphasis in the original). Therefore, I conclude that King presented sufficient evidence to support a finding that she left work for good cause and that she previously supplied her employer with a medical statement regarding her disability, as required by 7 DCMR §§ 311.4 and 311.7(e). Because I would affirm the judgment of the Office of Administrative Hearing's administrative law judge, I respectfully dissent.

**In re K.S., J.S., Appellant.**