*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 18-AA-963

DEA C. LOTT, PETITIONER,

v.

WASHINGTON LEGAL CLINIC FOR THE HOMELESS, RESPONDENT.

Petition for Review of the District of Columbia
Department of Employment Services
(2018-DOES-853)

(Argued January 16, 2020                                Decided December 31, 2020)

Dea C. Lott, *pro se*.

*Mary Lenahan* was on the brief for respondent. *John Cartwright*, admitted *pro hac vice*.

Before BECKWITH and MCLEESE, *Associate Judges*, and WASHINGTON, *Senior Judge*.

WASHINGTON, *Senior Judge*: Petitioner, Dea Lott, has asked this court to review an order of an Administrative Law Judge (ALJ) of the District of Columbia Office of Administrative Hearings (OAH), denying Ms. Lott's claim for unemployment compensation. The ALJ determined that Ms. Lott left her job voluntarily and failed to meet her burden of demonstrating that her resignation was for good cause connected with the work. Finding no error, we affirm.

**I.**

Petitioner was employed as a staff attorney at the Washington Legal Clinic for the Homeless (the Legal Clinic), a non-profit legal services and advocacy organization, from July 2014 until April 30, 2018. The Legal Clinic does not have a traditional hierarchical structure; instead it has a flat structure with a group of staff attorneys led by an executive director, Patty Fugere. Petitioner asserts that beginning in early 2017 she was subjected to a series of incidents at the Legal Clinic which, when considered cumulatively, amounted to racial discrimination that would have caused a reasonable person in her position to resign.

The first of these incidents occurred in June 2017, when petitioner contends that a co-worker, Staff Attorney Scott McNeilly, reprimanded her in front of the Legal Clinic's Volunteer Coordinator, Kelsey Vaughn, thereby "undermin[ing]" petitioner's perceived authority over her. Petitioner believes race "might have influenced" Mr. McNeilly's decision to handle the situation as he did. After notifying Ms. Fugere of her concerns, petitioner met with Mr. McNeilly a second time, during which she "walked through [things] for him from [her] perspective," at which point Mr. McNeilly became upset and asked petitioner how she could

believe his response was motivated by race. McNeilly later apologized to petitioner for becoming upset when she questioned him, explaining that at the time he "was angry that [she] had questioned [his] morality and . . . integrity" but "wanted to apologize . . . so that [they] could move forward."[1] The second incident involved the delay by one month of an anti-racism training for Legal Clinic employees organized by petitioner. Petitioner alleged this delay was due to a "lack of mandate or direction from the Legal Clinic's management that . . . gave individual staff members the option to decline training dates for any reason." The third incident cited by petitioner involved efforts by the management of the Legal Clinic to repeatedly thwart her efforts to recruit and secure a partnership between the Legal Clinic and Unity Health Care in Anacostia, which petitioner again attributed to the "lack of mandate or direction by the Legal Clinic's management." Petitioner also expressed concern over heightened tensions between herself, Volunteer Coordinator Kelsey Vaughn, a Caucasian woman, and triage attorney Akela Crawford, an African American woman. Petitioner contends that the fact that she is an African American played a role in Ms. Vaughn's unprofessional treatment of her especially after she observed petitioner being reprimanded by Mr. McNeilly. Additionally, petitioner complained of the lack of

---

[1] In an email apologizing to petitioner, Mr. McNeilly reiterated that he thought petitioner was "an excellent lawyer who cares deeply about the clients, the Clinic, and justice."

an office policy governing promotions and lateral transfers at the Legal Clinic. Specifically, petitioner claims that she was overlooked for a lateral staff attorney position, for which she had expressed an interest, in favor of a white co-worker.

On April 13, 2018, petitioner submitted her letter of resignation to the Legal Clinic's executive director. In the letter, she questioned the commitment of the management and staff to their anti-racism efforts; suggested that she was not given due respect as a professional and seriously considered for opportunities for professional growth as part of the Legal Clinic; and stated that her "work at the Legal Clinic" was impacting her personal health, life, and happiness. Petitioner's resignation took effect on April 30, 2018.

Subsequently, petitioner filed a claim for unemployment benefits. The claim was denied by a Claims Examiner on April 29, 2018, on grounds that petitioner had voluntarily resigned from her place of employment. Petitioner sought review of the Claims Examiner's decision before an ALJ of the OAH who affirmed the Claim Examiner's decision, concluding petitioner voluntarily resigned from her position at the Legal Clinic and failed to demonstrate that her resignation was for good cause connected with the work. This appeal followed.

## II.

Under District of Columbia law, it is presumed that an unemployed individual left work involuntarily and is eligible to receive unemployment benefits "'unless the claimant acknowledges that the leaving was voluntary or the employer presents evidence sufficient to support a finding . . . that the leaving was voluntary.'" *Nwokwu v. Allied Barton Sec. Serv.*, 171 A.3d 576, 582 (D.C. 2017) (quoting 7 DCMR § 311.2–.3). An employer meets its burden of showing that an employee voluntarily resigned by demonstrating that the "employee affirmatively acted to end the employment relationship." *Id.* However, even if an employee voluntarily resigns, the employee is still eligible to receive unemployment insurance benefits if the employee can prove by a preponderance of the evidence that he or she left their most recent employment for good cause connected with the work. *See Green v. District of Columbia Dep't of Emp't Servs.*, 499 A.2d 870, 877 (D.C. 1985) (internal citations omitted). This determination "is factual in nature, and turns on what a reasonable and prudent person in the labor market would do under similar circumstances." *Consumer Action Network v. Tielman*, 49 A.3d 1208, 1211 (D.C. 2012) (internal citation and quotation marks omitted).

This court reviews decisions of the OAH under the substantial evidence standard, and we must affirm an OAH decision when "(1) OAH made findings of fact on each materially contested issue of fact, (2) substantial evidence supports each finding, and (3) OAH's conclusions flow rationally from its findings of fact." *Castro v. Security Assurance Mgmt., Inc.*, 20 A.3d 749, 756 (D.C. 2011) (Schwelb, J. concurring) (quoting *Rodriguez v. Filene's Basement Inc.*, 905 A.2d 177, 180-81 (D.C. 2006)). In other words, "'we must uphold the agency action if it is supported by substantial evidence even if there is substantial evidence to support a contrary conclusion.'" *Castro*, 20 A.3d at 756 (quoting *Combs v. District of Columbia Dep't of Emp't Servs.*, 983 A.2d 1004, 1009 (D.C. 2009)).

## III.

As a threshold matter, petitioner contends the ALJ erred in concluding the Legal Clinic met its burden of establishing that she voluntarily resigned from her position. More specifically, petitioner argues that she did not voluntarily resign but was constructively discharged, and that the ALJ should have considered her evidence of racial discrimination as part of its voluntariness inquiry as opposed to using it to determine whether her resignation was for good cause connected with her work. We disagree. In unemployment cases we have recognized one

exception to the general rule that an employee who voluntarily resigns is not eligible to collect unemployment benefits. That exception is where an employee is forced to choose between resigning or being immediately discharged. Under those circumstances, the choice to resign is not considered a voluntary quit but a constructive discharge. Petitioner contends that we should also look at her resignation as a constructive discharge. However, the situations are not analogous. *See Green*, 499 A.2d at 876 ("[t]his court deems involuntary a resignation in the face of imminent discharge"). Here, petitioner was not facing an imminent discharge from her position as a staff attorney. Instead, she contends that she was forced to resign from her employment because of intolerable working conditions at the Legal Clinic. To prevail on that type of claim, petitioner has to show that a reasonable person facing similar working conditions would also have resigned. *See, e.g.*, *Wright v. District of Columbia Dep't of Emp't Servs.*, 560 A.2d 509, 513 (D.C. 1989) (burden on employee to demonstrate "she resigned for 'good cause' connected with her employment"). Here, there was no evidence presented by petitioner that she faced any imminent discharge or even any threat of discharge from her employer and therefore, the ALJ properly rejected petitioner's claim that she was constructively discharged in this case and thus eligible for unemployment benefits. In sum, the ALJ's determination that petitioner voluntarily resigned is

supported by sufficient evidence in the record. (*See* petitioner's resignation letter submitted on April 13, 2018.[2])

## IV.

Alternatively, petitioner argues that she has proven by a preponderance of the evidence that she was a victim of racial discrimination and unlawful retaliation,[3] and that the improper conduct also aggravated an existing known illness. Therefore, she contends that the ALJ erred in finding that her resignation was not for good cause connected to the work.[4] In response, the Legal Clinic

---

[2] "For a threatened termination to be imminent, the prospect of termination must be real." *Green*, 499 A.2d at 876 (internal citations and quotation marks omitted). Here, the record definitively establishes petitioner did not face any prospect of termination, as demonstrated by testimony from the executive director of the Legal Clinic who explained there was work available for petitioner had she not quit.

[3] Petitioner had to prove retaliation by a preponderance of the evidence and the ALJ found no evidence that petitioner was retaliated against for complaining about any perceived race discrimination to Ms. Fugere. We agree that the record is devoid of substantial evidence to support a finding of retaliation.

[4] "Reasons considered good cause connected with the work for voluntary leaving include, but are not limited to, the following: (a) Racial discrimination or harassment; . . . (e) Illness or disability caused or aggravated by the work; Provided, that the claimant has previously supplied the employer with a medical statement[.]" 7 DCMR § 311.7(a), (e).

offered testimonial and other evidence to refute petitioner's claims that she was the victim of racial discrimination and further offered evidence that the incidents complained of were not sufficiently egregious that they would cause a reasonable person to resign from his or her employment.

Viewing this record without requiring petitioner to prove racial discrimination in order to show good cause for her resignation, we understand our decisions interpreting the phrase "good cause connected to the work" to require, at a minimum, a showing of a racially hostile workplace that would cause a reasonable, similarly situated, person to resign; a showing the ALJ reasonably concluded petitioner failed to make. *See Tielman*, 49 A.3d at 1215 ("In determining whether an employee had good cause to leave his or her employment, a court should focus on the impact of the change on the employee."); *see also Taylor v. Unemployment Compensation Bd. of Review*, 378 A.2d 829, 834 (Pa. 1977) ("The degrading and abusive effects of the repeated expressions of racial prejudice were cumulative in nature and ultimately created an employment condition which would have been intolerable to any reasonable person in similar circumstances."); *Thompson v. Kentucky Unemployment Ins. Comm'n*, 85 S.W.3d 621, 625 (Ky. Ct. App. 2002) ("racial discrimination can constitute good cause to voluntarily terminate one's employment when it rises to a level 'so compelling as

to leave no reasonable alternative'"). While we have not before been faced with a claim of racial discrimination as good cause connected with the work for a voluntary quit in an unemployment compensation case, the above decisions are instructive and consistent with our prior decisions interpreting the District's unemployment statute. Like the courts in the cases cited above, we have consistently held that in order to prove that a resignation was for good cause connected with the work, an employee must present evidence that the employment situation has become so toxic that the employee's decision to leave is justified. *See Imperial Valet Servs. v. Alvarado*, 72 A.3d 165, 168 (D.C. 2013) (employee had good cause connected with the work for resignation where employer repeatedly verbally abused her, uttering profanities at her, for reasons that had no connection to the employee's job performance); *see also Cruz v. District of Columbia Dep't of Emp't Servs.*, 633 A.2d 66, 72 (D.C. 1993) (quoting 81 C.J.S. *Social Security* § 226, at 450 (1977 & Supp. 1993)) ("In order to constitute good cause, the circumstances which compel the decision to leave employment must be real, not imaginary, substantial, not trifling, and reasonable, not whimsical; there must be some compulsion produced by extraneous and necessitous or compelling circumstances."). Typically, we have not found good cause for a voluntary resignation unless the employer's conduct made continued employment intolerable or the circumstances involved situations where an employee has suffered an

unjustified adverse employment action that would cause a reasonable person to leave his or her employment without another job.  For that reason, we have held that even the denial of a promotion or a salary increase does not constitute good cause connected with the work because a reasonable person would not leave his or her employment without having obtained other gainful employment.  *Bowen v. District of Columbia Dep't of Emp't Servs.*, 486 A.2d 694, 698 (D.C. 1985).  By contrast, we have recognized that good cause exists where an employee was required to work overtime but was not appropriately compensated. *See Kramer v. District of Columbia Dep't of Emp't Servs.*, 447 A.2d 28, 29-30 (D.C. 1982); *see also Berkley v. District of Columbia Transit, Inc.*, 950 A.2d 749, 762-63 (D.C. 2008) (substantial reduction in employee's hours and employer's failure to pay wages constituted good cause to leave work).

In this case, petitioner is clearly unhappy with her perception of how she has been treated by some of her co-workers, especially Mr. McNeilly, who told her a case she was supervising did not need a volunteer attorney with hearing experience, a statement Ms. Lott understood as a reprimand "of the decisions that [she] made, both in case strategy as well as the type of attorney that [she] selected for this particular case."  However, the ALJ reasonably determined that any perceived animosity between petitioner and her co-workers did not establish the

kind of intolerable working condition that would cause a reasonable and prudent person to leave his or her job without first securing other employment. Unlike the circumstances in *Imperial Valet Servs.*, 72 A.3d 166-68, where we upheld a decision that the resignation was for good cause connected to the work because evidence was presented that the employee's supervisor had a habit of repeatedly calling the employee "stupid" and a "piece of crap" while she was working, here the ALJ found no evidence that the one conversation complained of was instigated by a supervisor, was overtly disrespectful, or that it contained any racially charged or otherwise derogatory comments. Thus, the evidence in the record supports the ALJ's conclusion that a reasonable and prudent employee would not have felt compelled to leave his or her employment based on the conversation as alleged by petitioner in this case.

Petitioner's claim that she was not considered for a lateral staff attorney position for which she expressed an interest is equally unavailing. This is particularly so where there is no evidence in the record that Ms. Lott applied for the position in question.[5] However, even had petitioner's claim that she applied

---

[5] Ms. Fugere, the Legal Clinic's director, testified that although petitioner expressed an interest in laterally transferring to this open position, because the responsibilities associated with the position were being modified, petitioner's interest was contingent upon the ultimate responsibilities assigned to the role. Ms.

(continued…)

for the position but was not considered been accepted as true, it still would not have amounted to good cause connected with the work to resign. The undisputed evidence is that the attorney position she sought was not a promotion and that it would not have resulted in a salary increase. Further, because of the structure of the Legal Clinic, it does not appear that the position could be considered a stepping stone to a supervisory attorney position. While we understand petitioner's disappointment in not being selected for the position, we have held that without more, even the denial of a promotion or salary increase does not amount to good cause connected with the work. *See Bowen*, 486 A.2d at 698 ("petitioner offered no evidence which would . . . support a finding that a 'reasonable and prudent and person' would have resigned simply because he failed to gain a promotion or salary increase"). Therefore, it is difficult to conceive of a situation where the denial of a lateral position would be sufficient to compel a reasonable and prudent person to leave his or her employment without having another job.

---

(…continued)
Fugere testified that once the position was finalized, she had no recollection of petitioner expressing an interest in the position, and assumed petitioner was not interested because she never raised her interest in the position again. Petitioner testified that she expressed interest in the position via email and never received a response from Ms. Fugere. However, the record shows petitioner sent this email nine days before the position was finalized and that an announcement with application instructions had been circulated among the entire Legal Clinic staff much earlier. There is no indication in the record that petitioner followed the detailed application process set out in this announcement.

Petitioner next argues that delays in implementing certain programs under her supervision, and the Legal Clinic's general lack of support for other programs she favored, compelled her to resign. Specifically, she contends that the delayed anti-racism training organized by petitioner and the failed partnership between the Legal Clinic and the Unity Health Clinic in Anacostia were due to the lack of a mandate by the Legal Clinic's leadership and indicative of the discriminatory animus she was facing on the job. However, given that the training was only delayed by one month, and the failed partnership did not affect her working conditions at the Legal Clinic, we find that the ALJ reasonably concluded that these claims did not create the kind of racially hostile work environment that would cause a reasonable person to resign.[6] At best, petitioner's complaints here

---

[6] We understand a hostile work environment to be "an environment which is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Barrett v. Covington & Burling, LLP*, 979 A.2d 1239, 1246 (D.C. 2009) (internal citation and quotation marks omitted). Although isolated incidents of offensive misconduct generally do not constitute actionable workplace harassment, "we have recognized that a single insult such as the use of an unambiguously racial epithet . . . by a supervisor may be severe enough, in and of itself, to create a hostile work environment." *District of Columbia Dep't of Public Works v. District of Columbia Office of Human Rights*, 195 A.3d 483, 495-96 (D.C. 2018) (internal citation, alterations, and quotation marks omitted). Conditions sufficient to constitute a racially hostile work environment include those where African American employees were repeatedly subjected to racially demeaning treatment, including derogatory racial comments, *Bartlette v. Hyatt*

(continued…)

reflect a general dissatisfaction with her employment, a circumstance that would not satisfy the good cause requirements under the Act.

We previously affirmed a determination by OAH that an employee's resignation was not for good cause and more appropriately was considered a voluntary resignation because of general dissatisfaction with the work where the employee resigned rather than accepting a transfer to another staff position. *Pyne v. Mb Staffing Servs.*, 39 A.3d 1258, 1261-62 (D.C. 2012). While we have not extensively explored all of the circumstances that would fall within the category of general dissatisfaction with the work, the limited circumstances in which we have found good cause connected with the work for a resignation strongly suggest that

---

(…continued)
*Regency*, 208 F. Supp. 3d 311, 322 (D.D.C. 2016), as well as where a deeply offensive racial epithet was directed at an employee by a co-worker who the employee was forced to continue working with for months until the co-worker's termination, *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 577 (D.C. Cir. 2013). In contrast, here, none of appellant's allegations, taken alone or together, indicate that appellant was subject to discriminatory conduct. *See Daka, Inc. v. Breiner*, 711 A.2d 86, 93 (D.C. 1998) ("'More than a few isolated incidents must have occurred, and genuinely trivial occurrences will not establish a prima facie case' [of a hostile working environment.]") (quoting *Howard Univ. v. Best*, 484 A.2d 958, 980 (D.C. 1984)). For instance, appellant's conversation with Scott McNeilly, during which she asserts to have been reprimanded, did not involve any racial or otherwise derogatory epithets that we have found severe enough for a single insult to create a hostile work environment. *See District of Columbia Dept. of Public Works*, 195 A.3d at 495-96.

most workplace unhappiness would fall within the category of general dissatisfaction with the work. There is very little case law from neighboring jurisdictions that address the topic but several decisions by the Appellate Division of the New York courts endorse this understanding and support the distinction that we articulate here. *See In re Rizzicone*, 32 A.D.3d 1056, 1057 (N.Y. App. Div. 2006) (resignation because employee felt his abilities and efforts were not appreciated after he received some criticism at work was no more than general dissatisfaction with the work that did not constitute good cause for leaving employment); *see also In re Woodcheke*, 53 A.D.3d 1011, 1011 (N.Y. App. Div. 2008) ("Neither dissatisfaction with one's work environment . . . an inability to get along with a difficult co-worker or supervisor . . . nor an employer's criticism of one's work performance constitutes good cause for leaving one's employment"); *In re Kremsky*, 32 A.D.3d 602, 602 (N.Y. App. Div. 2006) (employee's general dissatisfaction with her working environment did not constitute good cause for leaving employment where employee resigned because she felt she was being treated unfairly and that her work environment was uncomfortable). Here, petitioner's stated reasons for her resignation — her unhappiness with the delayed anti-racism training and the failed partnership between the Legal Clinic and the Unity Health Clinic in Anacostia, as well as her belief that she was not given due respect as a professional and seriously considered for opportunities for professional

growth as part of the Legal Clinic — fall within the category of concerns that reflect an employee's general dissatisfaction with his or her working conditions. Thus, we are satisfied that the ALJ's determination that petitioner's resignation was the result of general dissatisfaction with her employment, as opposed to for good cause connected to the work, is supported by the record.

Finally, petitioner contends the ALJ erred in finding that she did not establish good cause for her resignation based on illness aggravated by her work. Under District of Columbia law, "[i]llness or disability caused or aggravated by the work" can constitute good cause for leaving provided the former employee can show that "[he or] she supplied the employer with a 'medical statement' documenting the disability or illness before [he or] she resigned." *Chimes District of Columbia, Inc. v. King*, 966 A.2d 865, 868 (D.C. 2009) (quoting *Branson v. District of Columbia Dep't of Emp't Servs.*, 801 A.2d 975, 978 (D.C. 2002)); *see also* 7 DCMR § 311.7(e). It is the employee's obligation to provide his or her employer with a medical statement substantiating his or her claim that the illness or disability is caused or aggravated by his or her work. *Id.* at 869. The purpose of this requirement is to give the employer "'objective, professional verification' of the disabling illness and to permit the employer to take steps, if any, to

accommodate the employee and avoid a job-necessitated resignation." *Bublis v. District of Columbia Dep't of Emp't Servs.*, 575 A.2d 301, 303-04 (D.C. 1990).

Here, the record establishes that the Legal Clinic was well aware of petitioner's mental health challenges and had previously granted all of petitioner's requests for reasonable accommodations related to her anxiety and depression — efforts demonstrating good faith on the part of the clinic to maintain petitioner's employment, and not to terminate her for health challenges.[7] Because the Legal Clinic took steps to accommodate her needs, she cannot complain that her then existing conditions at work constituted good cause for voluntarily resigning from her position as a staff attorney. However, citing our decision in *Bublis*, petitioner now contends that the Legal Clinic was also on notice that petitioner's working conditions were "aggravating" her illnesses. There is a distinction between having notice of and reasonably accommodating an existing medical condition and notice that there are circumstances connected to an employee's work that are aggravating those illnesses. Unlike in *Bublis*, here the ALJ reasonably concluded that petitioner failed to timely present her employer with sufficient medical evidence

---

[7] Petitioner informed the Legal Clinic of her illness in a series of emails. However, when sharing this information with the Legal Clinic, petitioner did not adequately disclose that her illness was caused by or being aggravated by her working conditions.

that her working conditions were causing her medical or psychological problems.[8]

For that reason, the ALJ's finding that the Legal Clinic was not on notice of petitioner's claims that her working conditions were aggravating her existing illnesses is supported by evidence in the record and is therefore, not clearly erroneous.

For the foregoing reasons, the judgement of OAH is

*Affirmed.*

---

[8] It was not until Petitioner submitted her resignation letter that any clear and specific mention was made connecting her health and her work. In passing she mentions that she "considered how [her] work at the Legal Clinic impact[ed] [her] personal health, life, and happiness." However, prior to resigning, she never presented any medical documentation to the Legal Clinic that suggested that there was any causal connection between her work for the Clinic and her then existing mental health challenges. Nor had she asked that her working conditions be modified to accommodate her health needs. In fact, it was not until two months after she resigned that petitioner provided a record from her medical provider attesting that she suffered from acute anxiety resulting, in part, from job related stressors. However, because this affidavit is dated June 15, 2018, more than two months after petitioner's resignation, it cannot serve as a medical statement documenting her illness because it was not provided to her employer until months after her resignation. *See Chimes*, 966 A.2d at 868.