**CONSUMER ACTION NETWORK,**
**Petitioner,**

v.

**Frances TIELMAN, Respondent.**

**No. 11–AA–350.**

District of Columbia Court of Appeals.

Argued April 11, 2012.

Decided Aug. 16, 2012.

ment leaves us unsure about the relevance of the arguments that the Employer now makes about PCIGC.

Robert Scott Petersmeyer, of the bar of the State of California, pro hac vice, by special leave of court, for petitioner. Connie N. Bertram, Washington, filed the brief for petitioner.

John C. Keeney, Jr., Legal Aid Society of the District of Columbia, with whom Julie H. Becker, Legal Aid Society, Washington, was on the brief, for respondent.

Before FISHER and OBERLY, Associate Judges, and PRYOR, Senior Judge.

FISHER, Associate Judge:

Frances Tielman voluntarily quit her job with Consumer Action Network after the organization cut her hours, and thus her wages, by twenty-five percent and reduced

her employee benefits. An administrative law judge (ALJ) of the District of Columbia Office of Administrative Hearings determined that Ms. Tielman had good cause to leave her work based on the reduction in her wages and benefits, and awarded her unemployment compensation. Although we agree with the ALJ that a substantial reduction in wages *may* constitute good cause, we need further information to evaluate whether, on the facts of this case, Ms. Tielman had good cause to quit. We therefore remand for further proceedings not inconsistent with this opinion.

## I. Factual Background

Petitioner Consumer Action Network (CAN) is a non-profit organization that receives government funding to assist individuals struggling with mental health issues. On October 11, 2010, CAN informed its full-time employees that, due to a recent budget decrease, their hours would be cut from forty per week to thirty. Because the employees would be working twenty-five percent fewer hours, their salaries also would be reduced by twenty-five percent. In addition, CAN's contribution to its employees' health insurance premiums would fall from one hundred percent to fifty per cent. At a staff meeting the next day, CAN announced that other employee benefits, such as the amount of annual leave to which employees were entitled, would also be reduced.

Respondent Frances Tielman, CAN's Director of Training, determined that she could not afford to live on this reduced compensation and resigned on October 17, 2010. In her letter of resignation, she cited the reduced hours and consequent drop in pay as the reason for her departure. She also mentioned a number of other work issues with which she was dissatisfied.

Ms. Tielman applied for unemployment compensation benefits from the District of Columbia Department of Employment Services (DOES), which denied her request because her "reduction in pay [was] not substantial and a reasonable and prudent person would not leave available work." On appeal, an ALJ of the Office of Administrative Hearings (OAH) reversed. Although the ALJ found that Ms. Tielman had voluntarily left her employment, she concluded that Ms. Tielman had "good cause [to quit] connected with the work" based on the twenty-five percent reduction in salary and the fifty percent decrease in CAN's contribution to her health insurance premiums. *See* D.C.Code § 51–110(a) (2009); 7 DCMR § 311 (1986). She therefore held that Ms. Tielman qualified for unemployment compensation.

## II. Standard of Review

This court's review of a decision by OAH is limited. *See* D.C.Code § 2–510 (2011). "To pass muster, '(1) the decision must state findings of fact on each material, contested factual issue; (2) those findings must be based on substantial evidence; and (3) the conclusions of law must follow rationally from the findings [of fact].'" *Howard Univ. Hosp. v. District of Columbia Dep't of Emp't Servs.*, 960 A.2d 603, 606 (D.C.2008) (quoting *Perkins v. District of Columbia Dep't of Emp't Servs.*, 482 A.2d 401, 402 (D.C.1984)).

■■■ "Once it has been established that the claimant left her job voluntarily, she bears the burden of proving that she did so for 'good cause connected with the work.'" *Id.* at 1261 (citing 7 DCMR § 311.4). The determination of whether an employee had good cause "is factual in nature, and turns on what 'a reasonable and prudent person in the labor market' would do under similar circumstances." *Cruz v. District of Columbia Dep't of Emp't Servs.*, 633 A.2d 66, 70 (D.C.1993) (quoting *Kramer v. District of Columbia*

*Dep't of Emp't Servs.*, 447 A.2d 28, 30 (D.C.1982)). Because it is largely a factual question, an agency's determination of whether good cause existed is subject to deferential review under the substantial evidence standard. However, the narrow question of whether a significant reduction in wages and benefits may ever constitute "good cause connected with the work" is a legal conclusion that we review *de novo*. *See Odeniran v. Hanley Wood, LLC*, 985 A.2d 421, 424 (D.C.2009) ("[R]eview of an agency's legal rulings is *de novo*, for it is emphatically the province and duty of the judicial department to say what the law is, and the judiciary is the final authority on issues of statutory construction.") (quotation marks omitted).

## III. Legal Analysis

### A. Substantial Evidence Supports the ALJ's Factual Findings

As an initial matter, CAN claims that the ALJ erred in finding that Ms. Tielman left her employment due to the reduction in her salary and the increase in her health insurance premiums. According to CAN, the evidence in the record showed that Ms. Tielman "quit because of her general dissatisfaction with her work." CAN highlights Ms. Tielman's own testimony regarding her numerous grievances, including, among other things, her difficulties accessing the building in the morning, having to clock in and out of the office, the revocation of her access to one of the organization's computer drives, and her perception that her work responsibilities had been reduced.

There certainly was evidence that Ms. Tielman was dissatisfied with many aspects of her work. Nevertheless, substantial evidence supports the ALJ's finding that she quit due to the reduction in her wages and the decrease in CAN's coverage of her health insurance premiums. *See Ferreira v. District of Columbia*

*Dep't of Emp't Servs.*, 667 A.2d 310, 312 (D.C.1995) ("We will affirm the agency's findings of fact ... as long as they are supported by 'substantial evidence' notwithstanding that there may be contrary evidence in the record (as there usually is)."). Both at the hearing before the ALJ and in her resignation letter, Ms. Tielman explicitly cited the "reduction in hours" and the corresponding "25% drop in pay" as the reason for her departure. She also mentioned the increased cost of her health insurance premiums.

Moreover, as the ALJ observed during the hearing, many of the other work-related concerns described by Ms. Tielman, and now raised by CAN as alternative reasons for her departure, had begun or taken place months before she ultimately decided to quit. When asked why she had not resigned at an earlier time, Ms. Tielman explained that she had decided to "stick with it" because she had "a family to support" and "financial obligations." She then described the changes to her compensation as the "last straw." The ALJ sought clarification, asking "if the reason you finally decided to resign had more to do with ... the financial aspects of the new contract provisions," or "the things that you had experienced beforehand." Ms. Tielman acknowledged that her work situation had been deteriorating for a while, but explained that "having it now affect my finances as well as everything else just was the last" straw. In short, there was ample evidence to support the ALJ's finding that Ms. Tielman left her position because of the reduction in her wages and the increased cost of her health insurance premiums.

### B. A Substantial Reduction in Compensation May Constitute "Good Cause Connected With the Work"

Under the District's unemployment compensation statute, an employee is disquali-

fied from receiving unemployment benefits if he or she voluntarily left employment "without good cause connected with the work." D.C.Code § 51–110(a). "The circumstances which constitute good cause connected with the work shall be determined by the Director based upon the facts in each case." 7 DCMR § 311.5. The test for determining good cause is what "a reasonable and prudent person in the labor market [would] do in the same circumstances." *Id.*

By regulation, the District has specified a number of circumstances that do and do not "constitute good cause connected with the work for voluntary leaving." 7 DCMR §§ 311.6, -.7. Racial or sexual harassment, work-related illness or disability, and unsafe working conditions, among others, are considered good cause. *Id.* § 311.7. Personal or domestic responsibilities, a transfer from one type of work to another which is reasonable and necessary, and an employee's general dissatisfaction with work are not. *Id.* § 311.6. Both of these lists are illustrative, not exhaustive.

The only provision addressing the effect of a change in an employee's compensation states that a "minor reduction in wages" shall not be good cause. *Id.* § 311.6(b). However, neither the District's statutes nor its regulations specify whether a substantial reduction in wages and benefits may constitute good cause connected with the work. *See id.* § 311.7.

A fair reading of §§ 311.6 and 311.7 in combination suggests that the District chose to leave open to future regulation or adjudication the question of whether a substantial reduction in compensation may constitute good cause. If the District had intended to exclude from unemployment benefits all employees who voluntarily quit due to wage reductions, it would not have limited the provision in § 311.6 to those reductions in wages that are "minor." *See Carlson Const. Co. v. Dupont W. Condo.,*

*Inc.,* 932 A.2d 1132, 1136 (D.C.2007) ("A basic principle is that each provision of the [regulation] should be construed so as to give effect to all of the [regulation's] provisions, not rendering any provision superfluous." (citing *Thomas v. District of Columbia Dept. of Empt. Servs.,* 547 A.2d 1034, 1037 (D.C.1988))). On the other hand, there is no corresponding provision in § 311.7 addressing substantial wage reductions. The regulation's silence on the effect of a substantial reduction in wages leads us to conclude that the District deliberately left open whether an employee who quits due to a substantial change in compensation should be eligible for unemployment compensation.

This court has issued no controlling precedent on whether a substantial reduction in wages, on its own, may constitute good cause. However, our decision in *Berkley v. District of Columbia Transit, Inc.,* 950 A.2d 749 (D.C.2008), is instructive. Ms. Berkley resigned from her position as a driver's assistant after her employer reduced her hours from full-time to four hours or less per day. *Id.* at 752, 754. Her employer also had failed to pay her for some of her work, and one of the paychecks she later received for this work bounced. *Id.* at 760. In view of these circumstances, we expressed "doubts" as to whether Ms. Berkley's departure had been "voluntary." *Id.* However, even assuming that she had voluntarily left her employment, we concluded that Ms. Berkley may have had good cause to quit based on her employer's failure to pay her for some of her work and the "substantial change from her earlier work schedule." *Id.* at 762; *see* 7 DCMR § 311.7(c) (failure to provide remuneration for employee services constitutes good cause connected with the work). Accordingly, we remanded for further proceedings. *Berkley,* 950 A.2d at 763.

As we observed in *Berkley*, it is "understandable that a reasonable person who experienced such a [substantial] change in hours would seek other employment." *Id.* at 762. To continue in such a position, despite the reduced wages and benefits, might impose a significant economic hardship. *See Couch v. North Carolina Emp't Sec. Comm'n*, 89 N.C.App. 405, 366 S.E.2d 574, 578 (1988) (continuation of employment "might not be economically feasible for the affected employee"), *aff'd*, 323 N.C. 472, 373 S.E.2d 440 (1988) (per curiam). Indeed, the vast majority of courts to have considered this issue have held that a substantial reduction in wages may provide an employee with good cause to quit. *See, e.g., Boucher v. Maine Emp't Sec. Comm'n*, 464 A.2d 171, 176 (Me.1983); *Mississippi Emp't Sec. Comm'n*, 407 So.2d 109, 111 (Miss.1981); *LaRose v. Dep't of Emp't Sec.*, 139 Vt. 513, 431 A.2d 1240, 1242 (1981).[1]

■ Like our sister courts, we hold that a substantial reduction in compensation *may* provide an employee with good cause connected with the work to leave his or her employment. But this is not a *per se* rule. *See* 7 DCMR § 311.5 ("The circumstances which constitute good cause connected with the work shall be determined by the Director based upon the facts in each case."). Only those substantial reductions that would prompt "a reasonable and prudent person in the labor market" to quit "in the same circumstances" ultimately constitute good cause. *See id.*

## C. Are CAN's Circumstances Relevant?

CAN contends that a reduction in compensation, even if substantial, should not constitute good cause when an employer facing economic difficulties takes this step in order to avoid layoffs. This argument misconceives the remedial and humanitarian purpose of the District's unemployment compensation statute, which was designed to protect employees against the economic dependency caused by temporary unem-

---

1. CAN claims that a number of courts have held that a substantial reduction in wages "did not constitute good cause under the facts presented." It is true that some jurisdictions appear to have adopted this rule. *See, e.g., In re Ebisike*, 306 A.D.2d 777, 761 N.Y.S.2d 537, 537 (2003) ("In general, dissatisfaction caused by a reduction in work hours may not constitute good cause for leaving employment...."). Consequently, not all of the decisions on this issue can be harmonized. Nevertheless, many of the cases CAN cites are distinguishable. For example, in *Stapleton v. Ohio Dep't of Job & Family Servs.*, the court of appeals held that a sixty-five to seventy-five percent reduction in wages did not provide an employee with good cause to quit because the employee "was significantly, if not primarily, responsible for the situation that led to her reduced hours" and because the wage reduction was "temporary" and would only last for two or three weeks. 163 Ohio App.3d 14, 836 N.E.2d 10, 17 (2005); *see also Miller v. Help At Home, Inc.*, 186 S.W.3d 801, 810 (Mo.Ct.App.2006) (two-week reduction in hours did not constitute good cause). We agree with the Ohio court that a brief reduction in wages or one that was attributable to the employee would not likely be sufficient to constitute good cause. However, CAN has not argued, nor could it, that Ms. Tielman was responsible for the reduction in her hours or that the reduction was temporary. In other jurisdictions, courts have noted that the relevant unemployment statute provided for partial unemployment compensation benefits, suggesting a legislative preference for employees to continue with partial employment. *See, e.g., Div. of Emp't Sec. v. Labor & Indus. Relations Comm'n*, 625 S.W.2d 882, 884 (Mo.Ct.App.1981); *cf. In re Orenstein*, 173 A.D.2d 1029, 570 N.Y.S.2d 441, 442 (1991) (affirming denial of unemployment benefits where the claimant left her job due to reduced hours and wages because "she could have stayed employed and supplemented her earnings with partial unemployment insurance benefits"). Neither party in this case briefed the issue of whether partial unemployment compensation benefits were available to Ms. Tielman.

ployment and to reduce the need for other welfare programs. *Washington Times v. District of Columbia Dep't of Emp't Servs.*, 724 A.2d 1212, 1216 (D.C.1999).

We recognize that "it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law." *District of Columbia Dep't of Mental Health v. Hayes*, 6 A.3d 255, 260 (D.C.2010) (quoting *Rodriguez v. United States*, 480 U.S. 522, 526, 107 S.Ct. 1391, 94 L.Ed.2d 533 (1987) (per curiam)). We also recognize that employers sometimes face hard economic choices, and that a "share the pain" approach may sometimes seem most fair.[2] But the fact that a reduction in wages is "imposed upon all ... employees instead of only upon a single one does not preclude it from being good cause for leaving for each of them." *Bunny's Waffle Shop, Inc. v. California Emp't Comm'n*, 24 Cal.2d 735, 151 P.2d 224, 228 (1944).

In determining whether an employee had good cause to leave his or her employment, a court should focus on the impact of the change on the employee, not on the reasonableness of the employer's strategy for dealing with economic setbacks. *See Duncan v. Dir., Emp't Sec. Dep't*, 79 Ark. App. 367, 88 S.W.3d 858, 860 (2002) ("[A] substantial reduction in pay, even if attributable to economic conditions beyond the employer's control, will not bar a finding that the reduction constitutes good cause for quitting."); *Steinberg Vision Assocs. v. Unemployment Comp. Bd. of Review*, 154 Pa.Cmwlth. 486, 624 A.2d 237, 240 (1993) ("the focus of the inquiry [is] the impact upon the employee"; it is not a defense that employer made changes "in good faith and out of economic necessity"); *see also Tombigbee Lightweight Aggregate Corp. v. Roberts*, 351 So.2d 1388, 1390 (Ala.Civ.App.1977) (reduction in earnings was good cause to leave employment, even though it was due to an economic depression).[3]

2. The federal government and the District of Columbia have addressed these competing concerns by establishing voluntary programs known as "short-time compensation programs," *see* 26 U.S.C. § 3306(v) (2012), or "shared work unemployment compensation programs," *see* D.C.Code §§ 51–171 to –178 (2012 Supp.). For example, in D.C.Code § 51–172, effective October 15, 2010, the Council provided that "[t]he Director shall establish a shared work unemployment compensation program ... [,]" which "means a voluntary program designed to reduce unemployment and stabilize the work force by allowing certain employees to collect unemployment compensation benefits if the employees share the work remaining after a reduction in the total number of hours of work and a corresponding reduction in wages," D.C.Code § 51–171(9). To be eligible for such benefits, an employee must, among other things, work for an employer that has chosen to participate in the program. D.C.Code §§ 51–173, –177. The temporary version of this legislation was in effect at the time CAN reduced Ms. Tielman's hours. *See* D.C. Law No. 18–199 (ef-

fective July 23, 2010). Neither party mentioned these legislative remedies, and it is not clear from our own research that these programs have yet been implemented in the District of Columbia.

3. We are not persuaded by the contrary cases cited by CAN. In some of these cases, the wage reductions were "minor" and therefore would not have qualified employees for unemployment benefits even absent the employer's economic difficulties. *See, e.g., Quillen v. Review Bd. of Indiana Emp't Sec. Div.*, 468 N.E.2d 238, 242 (Ind.Ct.App.1984) (employee whose hours were reduced because, among other things, "the employer's level of business had slackened," did not have good cause to leave since she would have "earn[ed] nearly the same weekly amount" under the reduced hours as she had before); *Zanesville Rapid Transit, Inc. v. Bailey*, 168 Ohio St. 351, 155 N.E.2d 202, 206 (1958) (employees did not have good cause to quit when employer, which was in "straitened circumstances," announced that it planned to reduce all wages by ten percent). In another case, the economic slowdown mentioned by the court was only "seasonal," and therefore temporary.

Focusing on the employee helps to ensure that the broad remedial purposes of the statute are fulfilled. If a substantial reduction in wages could not constitute good cause, an employer might attempt to prevent an employee from receiving unemployment benefits simply by reducing the employee's wages or hours (thus forcing her to quit) rather than discharging her outright. *See Manias v. Dir. of Div. of Emp't Sec.*, 388 Mass. 201, 445 N.E.2d 1068, 1069 (1983); *Robertson v. Brown*, 139 So.2d 226, 229 (La.Ct.App.1962).

■ CAN also argues that, as a "nonprofit dedicated to helping the most vulnerable in society," it "should be afforded greater deference" when DOES is determining whether a reduction in wages constitutes good cause. However, as our cases demonstrate, employees do not lose their entitlement to unemployment compensation merely because they work for non-profit employers. *See, e.g., Scott v. Behavioral Research Assocs.*, 43 A.3d 925 (D.C.2012); *Cruz*, 633 A.2d 66. We therefore will apply to CAN the same rules that apply to other employers.

### D. Further Fact–Finding Is Necessary

In this case, Ms. Tielman's hours were cut by twenty-five percent, resulting in a twenty-five percent reduction in her wages. Many courts have held that a twenty-five percent reduction in wages is substantial and may be sufficient to constitute good cause. *See Bunny's Waffle Shop v. California Emp't Comm'n*, 24 Cal.2d 735, 151 P.2d 224, 228 (1944) (twenty-five percent reduction in wages constitutes good cause); *Dubkowski v. Adm'r, Unemployment Comp. Act*, 150 Conn. 278, 188 A.2d 658, 659–61 (1963) (same); *Scott v. Photo Ctr., Inc.*, 306 Minn. 535, 235 N.W.2d 616, 616–17 (1975) (per curiam) (same); *see also* MARK A. ROTHSTEIN ET AL., 2 EMPLOYMENT LAW 723 (4th ed. 2009) ("If the size of the reduction is 'substantial'— twenty to twenty-five percent or more— most courts will find that the claimants terminated their employment because of good cause associated with their employer.").

Moreover, Ms. Tielman faced additional reductions in her compensation. CAN reduced its coverage of her health insurance premiums by fifty percent, which the ALJ found would have increased her health insurance costs from $0 to $346 per month.[4] This amount was to be automatically deducted from Ms. Tielman's already reduced wages. Ms. Tielman claims she was told that, as an alternative, she could drop her health insurance plan entirely. *See Chavez (Token) v. Unemployment Comp. Bd. of Review*, 738 A.2d 77, 82 (Pa.Cmwlth. 1999) (significant reductions in health care benefits, along with other changes, may constitute good cause to quit employment).

---

*See Hedrick v. Emp't Div.*, 25 Or.App. 93, 548 P.2d 526, 527 (1976).

CAN also relies on *Best Chairs Inc. v. Review Bd. of Indiana Dep't of Workforce Dev.*, 895 N.E.2d 727 (Ind.Ct.App.2008). In that case, the court held that an employee did not have good cause to quit when she was transferred to another full-time position with the same employer at a lower hourly rate. *Id.* at 732. In coming to this decision, the court remarked that "[b]usinesses and employees alike are struggling with the current economic challenges, and we should strive to balance their respective interests when they diverge." *Id.* While we are not insensitive to these challenges, we believe that the District's unemployment compensation law, which is focused on the burden on the employee, prohibits us from undertaking a similar balancing here.

4. In Ms. Tielman's letter of resignation, she stated that she would be required to pay $346 per month to maintain her existing health insurance coverage. One of the exhibits, and some of the testimony, suggest that the monthly cost to Ms. Tielman might have been $323.16. CAN has not disputed the $346 figure and, in any event, the difference of $22.84 between the two figures would not affect the resolution of this case.

There also was evidence that other benefits, such as the number of days of annual leave, would be reduced.[5]

However, the record does not disclose enough facts to allow us to determine whether the reduction in Ms. Tielman's compensation gave her good cause to quit. Under the District's regulations, the test for good cause is "what would a reasonable and prudent person in the labor market do in the same circumstances?" 7 DCMR § 311.5. Our cases have not done much to elucidate this "reasonable and prudent person" test. But we have previously observed that, "[i]n order to constitute good cause, the circumstances which compel the decision to leave employment must be real, not imaginary, substantial, not trifling, and reasonable, not whimsical; there must be some compulsion produced by extraneous and necessitous or compelling circumstances." *Cruz*, 633 A.2d at 72 (citation omitted).

We thus may not accept uncritically Ms. Tielman's conclusory testimony that the reduction in compensation created a "hardship" and that she "didn't know how [she] was going to make ends meet. . . ." Often, people who are working full time struggle to make ends meet. Ms. Tielman's burden was to show that she acted as "a reasonable and prudent person in the labor market" would have done "in the same circumstances."

The regulation's reference to "the labor market" reminds us that unemployment compensation is not meant to be a long-term alternative to work. In order to be eligible for benefits, a claimant must be available and looking for work. D.C.Code § 51–109(4)(A), (B) (2009). Sometimes three-quarters of a job will be better than no job at all. After all, in many (though not all) fields, much of a job search can be conducted electronically and thus undertaken outside of core business hours. On the other hand, if an employer has a history of refusing to allow an employee to attend personal appointments, such as doctor's visits, during business hours, it may be difficult for an employee to set up and attend interviews. In such circumstances, it may be prudent for the employee to devote all of his or her time to looking for new employment.

---

5. CAN contends that the ALJ improperly treated the reduction in its coverage of health insurance premiums as a reduction in "wages," contrary to the District's unemployment compensation statute. *See* D.C.Code § 51–101(3)(A)(iii) (2009) (excluding health insurance costs from the definition of wages). However, our review of the record convinces us that the ALJ properly considered this cut as part of a reduction in Ms. Tielman's total *compensation*. Throughout her decision, the ALJ consistently referred to Ms. Tielman's wages and benefits as two separate components of her compensation: the "25% reduction in salary and an additional $346 per month for health insurance premiums"; the "reduced compensation and the increase in health insurance costs"; and "her salary was reduced by 25% and she was required to pay 50% of her monthly health care premiums ($346)." Although the ALJ concluded "that the reduced hours and the corresponding reduction in wages, combined with the additional burden of $346 per month for health insurances premiums, was a substantial reduction in *wages* and constituted good cause connected with the work," this imprecise use of the word "wages" does not invalidate the ALJ's clear conclusion that Ms. Tielman's overall compensation had been reduced substantially. And while the amount of unemployment compensation benefits provided to an employee is calculated based only on the loss in wages, *see* D.C.Code § 51–101(3), –107(b)(1) (2009), there is nothing in the District's unemployment compensation statute that prohibits consideration of the reduction in an employee's total compensation—wages *and* benefits—in determining whether he or she is eligible for unemployment compensation.

■■ Without purporting to create a comprehensive list of factors that should be considered in this and future cases, we identify a few examples of information that will assist in determining whether Ms. Tielman had good cause to quit. First, the record does not mention Ms. Tielman's salary. If one has a generous salary to start with (the example of an associate at a major law firm comes to mind), a twenty-five percent reduction in compensation might still leave the employee well-compensated, and the reduction would not constitute good cause to quit. (We certainly do not expect that Ms. Tielman's compensation was generous, but this type of information (which was known to CAN as well as to Ms. Tielman) should be established in cases applying a "reasonable and prudent person" test to a substantial reduction in wages.)

■■ We also do not know Ms. Tielman's monthly expenses, and thus there is no means of evaluating the impact of these compensation changes upon her—that is, whether the reduction in wages created a substantial economic burden in covering living and work-related expenses, including transportation and child care, such that a reasonable person in the workforce would have chosen to be unemployed while seeking alternative employment.[6] *See, e.g., Tate v. Mississippi Emp't Sec. Comm'n,* 407 So.2d 109, 111 (Miss.1981) (employee had good cause to quit because child care would have cost more than employee's reduced wages).

■■ The reasonableness and prudence of Ms. Tielman's decision may also be affected by the level of benefits available from unemployment compensation and other programs. For example, it would be helpful to know whether partial unemployment benefits are available in the District of Columbia, and thus whether Ms. Tielman might have been able to replace a portion of her lost wages. *See* D.C.Code § 51–101(5) (2009) (deeming an individual " 'unemployed' ... with respect to any week of less than full-time work if 80% of the earnings payable to him with respect to such week are less than his weekly benefit amount plus $20"); *id.* § 51–107(e) (providing for reduced unemployment benefits if claimant has other income); see also *supra* note 2 (shared work unemployment compensation program). We need to know facts such as these in order to determine whether Ms. Tielman's decision to quit was the action of "a reasonable and prudent person in the labor market." *See* 7 DCMR § 311.5.[7]

By remanding, rather than reversing, we are not relieving Ms. Tielman of her burden of proof. In this case, the ALJ found that she had carried that burden. But, given the lack of precedent in this jurisdiction, it was not clear at the time of the hearing what information Ms. Tielman needed to furnish in order to demonstrate good cause. Indeed, much of this information, such as her salary or the availability of other benefits, is irrelevant in cases of individuals who voluntarily quit for reasons unrelated to compensation, such as racial

---

**6.** We do not mean to suggest that an employee must provide a detailed list of living expenses, or that an ALJ should simply compare the reduced wages to the employee's expenses. However, information about particular expenses, such as student loans, rent, utilities, food, health insurance, and child care may shed light on whether a reduction in wages would impose a substantial economic burden on an employee.

**7.** We emphasize that the "issue is whether the claimant's *actual* course of conduct was reasonable and prudent, not whether some other course of conduct would have been *more* prudent." *Bowen v. District of Columbia Dep't of Emp't Servs.,* 486 A.2d 694, 698 n. 5 (D.C. 1985).

or sexual harassment. For these reasons, a remand to enable Ms. Tielman to present additional evidence in accordance with this opinion "is just in the circumstances." *See* D.C.Code § 17–306 (2001).[8]

## IV. Conclusion

For the foregoing reasons, we conclude that a substantial reduction in wages may, but does not necessarily, constitute good cause to quit. In addition, we affirm that portion of the OAH's decision which concluded that Ms. Tielman left her employment due to a substantial reduction in her compensation. We remand the case for additional fact-finding necessary to determine whether a reasonable and prudent person would have quit under similar circumstances.

*So ordered.*

---

8. We recommend that the Department of Employment Services be invited to participate in these proceedings on remand to furnish information about the availability of partial unemployment compensation and shared work programs in the District of Columbia, as well as to lend its expertise to the questions of statutory and regulatory interpretation presented in this matter. *See District of Columbia Dep't of Mental Health v. Hayes*, 6 A.3d 255, 258 (D.C.2010) ("We 'defer to an agency's interpretation of a statute or regulation it is charged with implementing if it is reasonable in light of the language of the statute (or rule), the legislative history, and judicial precedent.' " (quoting *Travelers Indem. Co. v. District of Columbia Dep't of Emp't Servs.*, 975 A.2d 823, 826 (D.C.2009))).